UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION


DAVID BONENBERGER,                    )
                                      )
                Plaintiff,            )
                                      )
     v.                               ) No. 4:12-CV-21-CDP
                                      )
THE ST. LOUIS METROPOLITAN POLICE     )
DEPARTMENT, et al.,                   )
                                      )
                Defendants.           )


JURY TRIAL

EXCERPT OF CLOSING ARGUMENTS
FROM VOLUME 3


BEFORE THE HONORABLE CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE


AUGUST 21, 2013



APPEARANCES:

For Plaintiff:       Brandy B. Barth, Esq.
                     Lynette M. Petruska, Esq.
                     PLEBAN & PETRUSKA LAW, L.L.C.
                     2010 S. Big Bend Blvd.
                     St. Louis, MO  63117

For Defendants:      Christopher R. Hoell, AAG
                     Dana W. Tucker, AAG
                     ATTORNEY GENERAL OF MISSOURI
                     P.O. Box 861
                     St. Louis, MO  63188

REPORTED BY:         Gayle D. Madden, CSR, RDR, CRR
                     Official Court Reporter
                     United States District Court
                     111 South Tenth Street, Third Floor
                     St. Louis, MO  63102
                     (314) 244-7987

2

## <u>INDEX</u>

Closing Argument by Ms. Petruska . . . . . . . . . . Page  3
Closing Argument by Ms. Tucker . . . . . . . . . . . Page 14
Rebuttal Closing Argument by Ms. Petruska  . . . . . . Page 28

1      (Excerpted proceedings began at 10:49 a.m.)

2      MS. PETRUSKA:  Thank you, Your Honor.  Good morning.

3  The good news is when you see me facing you like this again

4  the end is in sight, and so as I begin trying to explain this

5  case to you, I'd like to first thank you for being here, for

6  your time and your attention and your service in what is a

7  very important case to my client.  I told you at the beginning

8  of this case, factually, it's not very complicated.  It's

9  still not a complicated case.  It really comes down to who you

10  believe.  As we said during jury selection, you are the trier

11  of fact.  You decide what the facts are.  In this regard, you

12  decide the credibility of the witnesses.  Abraham Lincoln said

13  no man has a good enough memory to make himself a successful

14  liar.  Our own native son Mark Twain said a person who tells

15  the truth has nothing to remember.  You decide who's telling

16  the truth and who's not.  You do that based on the evidence in

17  this case.  I don't believe that that's going to be a very

18  difficult job for you to do.  In order to find for the

19  Defendants, you have to believe unequivocally Lieutenant Muxo.

20  If you believe Lieutenant Muxo, reward the Department, but if

21  you don't believe him, don't make a bad situation worse.

22      So let's talk about the evidence.  As I explained a

23  minute ago, your decision today is going to be based on

24  conflicting testimony.  Sergeants Boelling and Bonenberger

25  have told the same story consistently.  They're the ones that

1  have nothing to remember, but the same can't be said with

2  Lieutenant Muxo and Colonel Harris.  You've heard the evidence

3  in this case.  You've seen Sergeant Bonenberger's emails.  You

4  heard the Defendant say this is going to be a he said/she

5  said.  There's no he said/she said here.  You've got the

6  emails showing that Sergeant Bonenberger knew that he wasn't

7  going to get that job before he even applied for it.  In

8  contrast, shortly after the case was filed, Lieutenant Muxo

9  and Colonel Harris admitted that they exchanged emails about

10  who would fill the open Assistant Director position.  That's

11  really the start of the conspiracy here.  So if you find that

12  Lieutenant Muxo engaged in a conspiracy, you really have to

13  find that Lieutenant Harris engaged in a conspiracy because

14  the emails went to each other.  They both admitted this.

15          Use your common sense.  Would two people make the

16  same mistake on something this important?  Would a person

17  admit that -- to something being true without checking to see

18  if it was true first, particularly when that person is being

19  sued?  The emails exchanged between Lieutenant Colonel Harris

20  and Lieutenant Muxo about who would fill that Director

21  position -- they were never produced in this case.  Again, you

22  get to use your common sense.  They're now denying that these

23  emails ever existed.  Why?  They're denying that the emails

24  ever existed because they would show that Sergeant Bonenberger

25  and Sergeant Boelling are the ones telling the truth, not the

1    Defendants.

2            Do you believe Sergeant Bonenberger and Sergeant

3    Boelling?  They both told you the fix was in before Sergeant

4    Bonenberger even applied for that position.  Or on the other

5    hand, do you believe the Defendants, who, if you noticed, have

6    an answer for everything, but the answers they have given you,

7    they just don't make sense, and I'm going to talk about that a

8    little later, but let's first talk about Sergeant Boelling.

9    Do you really believe that she would come in here and tell you

10   lies as the Defendants would have you believe and subject

11   herself to cross-examination simply because she knew Sergeant

12   Bonenberger and they worked together for several years?  Any

13   motive to lie in this case would be to support the Defendants,

14   to gain favor with the command staff and not to risk her

15   career by telling you the truth.  Sergeant Boelling told you

16   she had several informal conversations with Lieutenant Muxo

17   about who was going to fill the Assistant Director position.

18   Lieutenant Muxo told her Colonel Harris wanted a black female

19   in the position.  When she recommended Sergeant Bonenberger

20   for the position, Lieutenant Muxo told her there was no way

21   Colonel Harris was going to let a white man fill the position.

22   When she asked Lieutenant Muxo who he was interested in

23   filling the position, it was Sergeant Angela Taylor, who

24   coincidentally got the job.

25            You heard Sergeant Bonenberger testify that he had

1    two different conversations with Lieutenant Muxo about that

2    Assistant Director position, one right after it was posted and

3    another one right after it was filled.  After the Assistant

4    Director position was posted, he called Lieutenant Muxo to

5    talk to him about the position.  Lieutenant Muxo told him not

6    to even bother putting in for it because it was going to a

7    black female because that's what Colonel Harris wanted.  After

8    the position was given to Sergeant Taylor, Lieutenant Muxo

9    sought Sergeant Bonenberger out at a barricaded subject scene.

10   He told Sergeant Bonenberger he had to bring color down to the

11   Academy because that's what Colonel Harris wanted.  Should you

12   believe Sergeant Bonenberger or Lieutenant Muxo?  Lieutenant

13   Muxo admits having both of those conversations, but he denies

14   that he ever said the position had to go to a black female

15   because that's what Colonel Harris wanted, to bring color down

16   to the Academy.

17        But fortunately, you don't just have to take Sergeant

18   Bonenberger's word for this because we have some other

19   evidence to support it.  Colonel Harris told you that when

20   Lieutenant McDuffie, a black male, left the Academy Director

21   position, he chose Lieutenant Henrietta Arnold for it, a black

22   female, but she didn't get the position because she had no

23   experience at the Academy, among other things that the Chief

24   testified about.  The Defendants want you to believe that the

25   position of Director and Assistant Director are somehow

1  different and, therefore, the Director needed experience but

2  the Assistant Director really didn't, but you don't have to

3  believe that claim, and the reason you don't have to believe

4  that claim is that the Department's own job description says

5  that two years of teaching experience or two years' experience

6  at the Academy was an absolute requirement for the job.

7          Lieutenant Muxo also wants you to believe that he

8  sought Sergeant Bonenberger out on that barricaded subject

9  scene just to talk to him about a driver training program that

10  didn't even exist yet.  Use your common sense.  Who does this?

11  Lieutenant Muxo sought Sergeant Bonenberger out on that scene

12  because he felt guilty.  He knew that he had to bring color

13  down to the Academy because of Colonel Harris, and as a

14  result, he knew that the best person didn't get the job, and

15  he was trying to throw Sergeant Bonenberger a bone, and the

16  bone that was thrown -- "Keep your mouth shut about what we

17  both know to be true, and I'll try to create a position for

18  you at the Academy, the place we both know you want to be

19  because that's where you put your heart, your soul, your

20  passion during your entire police career."

21          But like I said before, you don't have to just take

22  Sergeant Bonenberger's and Sergeant Boelling's word for all of

23  this, you don't have to believe them, their testimony that

24  they knew the position was going to be filled before Sergeant

25  Bonenberger applied for it, because we've got the two emails,

 1   the one to Sergeant Dandridge and the one to Lieutenant Muxo.

 2        On September 26th, 2010, Sergeant Bonenberger told

 3   Lieutenant Dandridge that he had already spoken to Lieutenant

 4   Muxo and there is somebody else already picked for the job.

 5   Lieutenant Muxo tried to convince you that the "him" Sergeant

 6   Bonenberger was referring to wasn't Lieutenant Muxo, but look

 7   at Exhibit 11.  You're seeing it now.  You can look at it

 8   again in your jury room.  Sergeant Bonenberger clearly told

 9   Sergeant Dandridge that he had already spoken to Lieutenant

10   Muxo about the Assistant Director's position.

11        Sergeant Bonenberger told Lieutenant Muxo on

12   October 1st of 2010, "I submitted my application for the

13   opening just in case something falls through with the person

14   that they have in mind."  This is what his wife was talking

15   about when she told you he was gathering all kinds of

16   information to show he was the best person for the job in that

17   off chance that they might really consider the best qualified

18   candidate for the job instead of the person of color.

19        Ask yourself, why would Sergeant Bonenberger send

20   these two emails unless Lieutenant Muxo had already told him

21   the position was going to a black female?  It just doesn't

22   make any sense.  Lieutenant Muxo testified he never responded

23   to Sergeant Bonenberger's email, claiming that it would be

24   improper to do so when the position was open because it might

25   be perceived as giving Sergeant Bonenberger some kind of

1  unfair advantage.  Again, you get to use your common sense.

2  The emails showed someone else had an unfair advantage, and

3  Lieutenant Muxo would have responded to that to correct that

4  false claim if it were in fact false.  The reason he didn't

5  respond to that email is because he knew it was true.

6           Finding Defendants Muxo, Harris, and Isom liable for

7  discriminating against Sergeant Bonenberger is fairly easy and

8  obvious, I think, but you may be wondering why the members of

9  the Board of Police Commissioners are Defendants in this case

10  when there's no evidence that they were part of the decision

11  to assign Sergeant Taylor to the Academy because of her race,

12  and I want to explain that and go back to Instruction 5 to do

13  that.  In this case, the members of the Board of Police

14  Commissioners are the employer, just like somebody else might

15  be employed by Boeing or Enterprise Leasing.  The members of

16  the Board of Police Commissioners, like any other employer,

17  can only act through their employees, in this case, Muxo,

18  Harris, and Isom.  Therefore, as you see in Instruction #5,

19  the discrimination of Defendants Muxo, Harris, and/or Isom

20  binds the members of the Board of Police Commissioners, making

21  them liable for this illegal discrimination, just like any

22  other entity would be liable for the illegal discrimination of

23  one of their employees.

24           So I also want to point out that Instruction 11

25  doesn't mean that the members of the Board cannot be liable

1   for the acts of Isom, Harris, and Muxo because Instruction 5

2   says that they can.

3         I also want to point out, as it is submitted in

4   Instruction #9, that the Plaintiff's race need not -- need

5   only have played a part in the Defendants' decision not to

6   give Sergeant Bonenberger the Assistant Director position.

7   That's all you need to find to find in his favor.  His

8   reason -- his race need not be the only reason for that

9   decision, so if you believe Lieutenant Muxo and that there

10  were other things that might have motivated him but you also

11  believe that race was a motivating factor, you can still find

12  in favor of the Plaintiff.

13        Now I want to take a few minutes to talk to you about

14  damages.  Damages are compensation, so, really, what I'm

15  talking to you about now is the money, but even as I'm talking

16  to you about money, I want to make it clear that to Sergeant

17  Bonenberger this case is about much more than money.  How do

18  you even put a dollar amount on losing your dream for an

19  illegal reason?  You heard Sergeant Bonenberger and his wife's

20  testimony.  He's lost sleep over this.  He lost weight

21  originally because of what happened to him.  He'll tell you

22  now he gained it back, but, you know, at the time it happened,

23  it had a big impact on him.  Both told you he's not the same

24  man today that he was before this discrimination happened to

25  him.  Sergeant Bonenberger knows that the one thing he can't

1   change, the one thing he can't do to get the Academy --

2   Assistant Academy Director position he wants so desperately --

3   he can't change the color of his skin.

4           THE CLERK:  Five minutes.

5           MS. PETRUSKA:  Thank you.

6           So if that's the criteria for the Assistant Director

7   position, he'll never get that job.

8           At this point, the color of Sergeant Bonenberger's

9   skin doesn't even matter.  You heard Lieutenant Muxo testify

10  that as long as he's at the Academy Sergeant Bonenberger will

11  never work there.  While Lieutenant Muxo claims that that's

12  because Sergeant Bonenberger lied about him, today, you're the

13  finder of fact; you get to decide who's telling the truth and

14  who's lying, not Lieutenant Muxo.  His day is over.  I submit

15  to you that Sergeant Bonenberger will never work his dream job

16  as long as he continues to work at the St. Louis Police

17  Department, and he will continue to suffer emotional damage

18  because of that.

19          You heard him say things used to roll off his back,

20  now they bother him.  It caused stress for his family.  He's

21  not as attentive to his son, his five-year-old son now --

22  three years old at the time it happened.  Sure, he still tries

23  to do the same job to the best of his ability, but things are

24  not the same, and they're never going to be the same.

25          His wife testified he's lost the spark, that her

1  husband really believed that if he did a good job, tried the

2  best, he could win that over, he could win over at the end of

3  the day, that color wouldn't matter, but it didn't work for

4  him.  He crashed into that wall.  You heard her testify that

5  her husband's years at the Academy were the happiest he ever

6  was, that he would have taught there for free.  She also told

7  you that the police department is like family, not just to him

8  but to both of them.  They both work there, and he's a guy's

9  guy, and what his family did to him made him angry,

10  disappointed, disillusioned.  She also told you that he's a

11  man's man, so he tries to hide all that, but she sees the

12  hurt.  She knows it's there.  She told you he's still obsessed

13  by the injustice because he likes to right wrongs, but this is

14  a wrong he can't right.

15         So, again, how do you value losing your dream?  How

16  do you value those things that make your life worth living,

17  those things that make your life the happiest, those things

18  that give you meaning?  Are those things worth $10,000,

19  $100,000, a million dollars?  Are they priceless?  I submit to

20  you there is a way to value Sergeant Bonenberger's damages,

21  his emotional damages.  He's been living with this intentional

22  illegal discrimination for three years now.  I suggest you

23  award him $100,000 for each of those years he's had to suffer

24  with this.  I further suggest that you award him another

25  $100,000 because he's going to have to live with this for the

1   rest of his life and the rest of his career, so I'm suggesting

2   you award a total of $400,000.

3          In addition to awarding Sergeant Bonenberger damages

4   for his emotional pain and suffering, you can punish the

5   Defendants, Lieutenants Muxo -- Lieutenant Muxo, Colonel

6   Harris, Chief Isom, for their intentional discrimination by

7   awarding Sergeant Bonenberger punitive damages.  Punitive

8   damages are awarded for the purpose of punishing a defendant

9   for engaging in misconduct and deterring that defendant and

10  others from engaging in the same misconduct in the future.  I

11  think punitive damages for Lieutenant Muxo and Sergeant or

12  Colonel Harris are fairly easy.  They engaged in intentional

13  discrimination.  You can punish that.

14         It may be a little harder to figure out why to punish

15  Sergeant or Chief Isom.  The standard is reckless

16  indifference.  You get to decide if he was recklessly

17  indifferent to the discrimination that was presented to him,

18  and I submit that there is sufficient evidence to find that

19  because he looked into this and he didn't even get it right.

20  I mean that's -- thank you.

21         Punitive damages, again, deter conduct.  A police

22  department is important.  You need to tell this department

23  that they can't march their colonels, their white shirts,

24  their lieutenants in here and lie to you to cover up illegal

25  discrimination.  That's a cancer in that department, and it

1    needs to end.  So what kind of money do you award for punitive

2    damages?  You know, again, is it $100,000?  Is it $200,000,

3    $500,000?  I don't know.  That's why you're in the jury box.

4    You're the voice of this community to say what we do to punish

5    this kind of conduct, and so I'm going to leave that to you,

6    but, again, as you're considering how you want to punish this

7    kind of conduct, you have to look at not only the

8    discrimination but the coverup and the coverup which

9    includes --

10                THE CLERK:  Time.

11                MS. PETRUSKA:  Thank you.

12                THE COURT:  You may proceed.

13                MS. TUCKER:  Thank you, Your Honor.  I'm actually

14    going to speak from the actual podium, so I can use the --

15                THE COURT:  Yeah.  You can just move the mike over if

16    you want, however you want to do it.  Yeah.  Either one is

17    fine.  Yeah, there you go.

18                MS. TUCKER:  Good morning, ladies and gentlemen.  The

19    defense would also like to extend to you their appreciation

20    for your attention and dedication with regards to this lawsuit

21    and asking you to also listen to all of the evidence in this

22    case and not just bits and pieces.  It's important that you

23    listen to all the evidence and look at the big picture here in

24    this case.

25                Ladies and gentlemen, when my colleague stood up here

1   in front of you on Monday morning, he told you in opening

2   statements that this case was going to consist of layer after

3   layer after layer of he said this and he said that and he said

4   this, and that is exactly what has happened over these past

5   two days.

6           I'd like to start with the Plaintiff in this matter,

7   Sergeant Bonenberger.  When this incident occurred,

8   Bonenberger had been with the Police Department for 17 plus

9   years.  As a matter of fact, when this position became

10  available for transfer, he had -- he was a sergeant.  He had

11  been a sergeant for a year and a half.  Now, if you recall, he

12  stood -- he sat on that stand and he testified in depth and at

13  length with regards to his responsibility for his -- this

14  platoon of officers that he managed.  He testified at length

15  with regards to it was his responsibility to provide guidance

16  to these officers and because this was his responsibility, he

17  was familiar with the policies and the procedures and the

18  special office or the special orders.  He was familiar with

19  everything, and it was also his responsibility to make sure

20  that he and his officers followed policy and procedure;

21  however, ladies and gentlemen, in September of 2010, when he

22  expressed an interest in the Academy -- in the Assistant

23  Academy Director's position, he was allegedly told by

24  Lieutenant Muxo that that position was going to an

25  African-American.  Now, when he said that, when Plaintiff's

1  counsel elicited that testimony, she also asked him, "Well,

2  when he -- when he -- when he told you that, did you tell

3  anybody; did you report it?"  His response was, "Not

4  directly."

5         So they went on.  She went on and asked, solicited

6  more questions and more testimony from him, and then he

7  decided that that indirect testimony or that indirect exchange

8  would have come -- would have been between he and one of his

9  friends at the Police Department, James Dandridge, and they

10  read from this particular email, and this is an email that it

11  went back and forth between James Dandridge, which he refers

12  to himself as Jim in the email, and Sergeant Bonenberger.  The

13  first entry was, "This has your" -- from -- from his friend

14  Jim to Bonenberger -- "This has your name all over it,"

15  referencing the Assistant Academy Director position.

16         Bonenberger responds back, "I appreciate the pat on

17  the back.  If you notice, I didn't meet the minimum

18  requirement of three years as a supervisor.  I'm still going

19  to put in for it just to see who they put there.  I don't

20  think there's anybody else that has the qualifications that I

21  do.  Just my opinion.  We'll see."

22         Jim goes back to Bonenberger, "I would talk to Muxo

23  also.  Thanks for the invite for the card party.  It totally

24  slipped my mind."

25         Bonenberger back to Jim, "No problem, Jim.  I already

1    spoke to him, and there is somebody else already picked for

2    the job.  We shall see who it is in the near future.  I'm sure

3    it is someone that is a much better choice and completely

4    competent and qualified for the position."

5           Ladies and gentlemen, there is nothing about this

6    email that either directly or indirectly advises his friend

7    Jim that he was told by Lieutenant Muxo that this position was

8    going to an African-American female, specifically, Angela

9    Taylor, because if you look at the last entry, Bonenberger

10   even says this position -- in his mind, this position was

11   going to somebody that was completely competent and a

12   qualified person.  That could not have been Sergeant Angela

13   Taylor because Bonenberger testified on numerous occasions

14   that she was not qualified.

15          After Plaintiff finished her direct testimony or her

16   direct of her client, I got up and I asked Bonenberger, "Now,

17   Sergeant Bonenberger, you knew hiring somebody based solely on

18   the color of their skin is wrong; you know that, right?"  He

19   testified, "Yes."

20          I then asked him if he was familiar with the policies

21   and procedures of the Department as it related to

22   discrimination.  Now, remember, just moments earlier, he had

23   testified that as a sergeant, as a platoon leader, as -- as --

24   as the person in charge of all these officers that he was in

25   charge of, he was familiar with all of the policies and

1    procedures and the special orders, and he said, yes, he was,

2    he was familiar with the policy and that being a

3    discriminatory practice.

4            I then asked him, "Well, Sergeant Bonenberger, you

5    knew this was a violation, so what did you do?  Who did you

6    tell?"  He sat, he thought, and then he finally said, "No one,

7    but I did file a grievance."

8            Okay.  So I showed Sergeant Bonenberger that

9    grievance, and this grievance will be in your exhibit package

10   under Plaintiff's Exhibit 13.  Sergeant Bonenberger and I went

11   through this grievance line by line by line.  He testified

12   that he could say anything in this grievance that he wanted to

13   say.  He was not limited to subject matter.  He was not

14   limited to the substance of what he could put in this

15   grievance.  The only thing he was limited to was possibly

16   these 11 lines; however, there's not even 11 lines there, but

17   the bottom line is he was not limited.  He could put any -- he

18   could grieve anything he wanted to grieve.  And what did he

19   grieve?  "I didn't get an interview."

20           Okay.  "So once again, Sergeant Bonenberger, where in

21   this particular document does it say you were discriminated --

22   you are grieving because you were discriminated against?

23   Where in this document does it say that Lieutenant Muxo told

24   you that an African-American was going to get this position

25   and not you?  Where in this agreement or where in this

1  grievance does it say that Lieutenant Muxo told you not even

2  to -- not even to bother applying for a position?"  He grieved

3  the fact that he did not get an interview.

4       So then we went on because he tried to justify his

5  grievance by saying, well, in the section marked "A fair

6  solution to my grievance," which is right down here, he wrote

7  in there, "The EEOC," and because he wrote or because he put

8  "EEOC" in there, then the Department should have just

9  automatically knew, they should have automatically -- flares

10 should have went off, they should have automatically known,

11 well, this is some kind of discrimination matter.  No.  It was

12 up -- it was up to Bonenberger to grieve the discrimination.

13 It wasn't up to the Department to try to figure out what was

14 in Bonenberger's head.

15      Ladies and gentlemen, it was not until months after

16 sulking that Bonenberger alleged for the very first time that

17 he had actually been discriminated against, and that's when he

18 filed his EEOC charge and this eventual lawsuit.  It wasn't

19 until months after sulking that Bonenberger made the

20 allegation that Muxo said that Lieutenant Colonel Harris said

21 that this position had to go to an African-American.

22      Now, ladies and gentlemen, Lieutenant Muxo also took

23 the stand in this case.  Lieutenant Muxo has been with the

24 Department for an extended period of time, well over 17 years.

25 He's been an officer, he's been a sergeant, and now he is a

1    lieutenant.  Lieutenant Muxo knows the policies and procedures

2    of the Department.  He knows what discrimination is.  He knows

3    discrimination is illegal.  He knows transferring someone into

4    a position solely based on the color of their skin is wrong.

5    Lieutenant Muxo testified to you that he had never had a

6    conversation with Bonenberger with regards to filling that

7    position with an African-American, either before or after the

8    job was posted or the position was filled.

9         Now, ironically, Sergeant Boelling, Bonenberger's

10   colleague of over seven years, came in and he sat down and he

11   testified -- she testified that Muxo also told her that he was

12   going to fill this position with Angela Taylor, specifically,

13   an African-American.  Now, ironically, this statement comes

14   from the person that's being transferred out of the position,

15   and why on earth -- Ms. Petruska told you, suggested to you

16   earlier to use your common sense.  I ask you to also do that.

17   Why on earth would Lieutenant Muxo go to Sergeant Boelling, of

18   all people, and say that?

19        Muxo also testified that he had never had any

20   conversations with Lieutenant Colonel Harris with regard to

21   the color of someone's skin and who -- and what color that

22   person needed to be for the Assistant Academy Director

23   position.  Sergeant Harris confirmed -- I mean -- I'm sorry.

24   Lieutenant Colonel Harris confirmed that.  He never talked to

25   Muxo about the color of somebody's skin with regards to who

1   was going to fill that position.  Lieutenant Colonel Harris

2   relied on Muxo to know what type of person he wanted for that

3   position, who he could work well with, and relied on his

4   recommendation and suggestions.

5          Counsel for Plaintiff also brought up several emails

6   that had gone back and forth between Bonenberger and

7   Lieutenant Muxo.  Now, ladies and gentlemen, in this day and

8   age with this technology, we all get email -- I would imagine

9   we all get emails daily.  I couldn't tell you what emails I

10  got yesterday or let alone two years ago.  I don't know, but

11  the bottom line is when we brought these emails to Lieutenant

12  Muxo's attention during the course of this trial, Lieutenant

13  Muxo didn't deny getting those emails.  He said that he -- he

14  could have got them or maybe he didn't get them; he just

15  wasn't sure, but he did know that if he did get them, those

16  are not the types of emails in his position as a lieutenant

17  over his unit that he would have responded to because he

18  felt -- he knew what Bonenberger was up to.  He knew

19  Bonenberger at that point was trying to get a leg up.  He knew

20  Bonenberger was basically trying to seal a position that also

21  Bonenberger knew had to go through the application process.

22          Now, ladies and gentlemen, there is no question,

23  there is no issue; we all concede the fact that Angela Taylor,

24  Sergeant Angela Taylor, was transferred into the position as

25  Assistant Academy Director.  She received this transfer

1    because none of the application -- none of the applicants,

2    neither she nor Bonenberger nor Buckeridge, the third person,

3    met the minimum qualifications.  None of them had been

4    sergeant for three years, although Bonenberger tried to say,

5    "Well, you know, I was -- I did act as a sergeant, so that

6    probably should have been considered."  No, he had not been a

7    sergeant for three years, so none of the applicants met that

8    first qualification.  However, Sergeant Angela Taylor did get

9    the position, but she did not get that position because of the

10   color of her skin.  She got that position because Lieutenant

11   Muxo had worked with her for several months in the Eighth

12   District.  Lieutenant Muxo had managed her for several months

13   in the Eighth District.  Lieutenant Muxo had watched her

14   command her platoon for several months while in the Eighth

15   District.  Lieutenant Muxo had watched her interact with the

16   people that she was in charge of.  Sergeant Bonenberger -- I

17   mean Lieutenant Muxo knew that she had the personality that he

18   needed in that position and the skill set.  He knew she could

19   bring those things to that position, and because of those

20   things and only because of those things did Lieutenant Muxo

21   make the recommendation that she be detached into the position

22   as Assistant Academy Director.  He did that with those reasons

23   and in conformity with the policies and procedures of the

24   Department that allowed him to do just that.

25            Now, also during that time, Lieutenant Muxo also knew

1    from his interactions with Bonenberger that although he was a

2    fine street cop -- Lieutenant Muxo didn't have any disparaging

3    words against Bonenberger with regards to his performance as a

4    police officer.  He said he was a fine cop; he was a good

5    street cop; if you needed something done on the streets,

6    Bonenberger was your guy.  Bonenberger's wife testified that

7    Bonenberger had arrest after arrest after arrest, but that is

8    not what Lieutenant Muxo's vision was for the Academy.  That

9    is not the person that Lieutenant Muxo, as Commander of that

10   unit, wanted to be the first face the recruits saw when they

11   came in the Academy.  Lieutenant Muxo knew for certain that

12   Sergeant Bonenberger, although a good street cop, did not have

13   the personality type or the skill set, despite the fact that

14   he taught.  Yeah, he had taught at the Academy, but teaching

15   at the Academy and being the Assistant Academy Director are

16   two different jobs.  They require two different skill sets.

17   They demand two different things.  You need two different

18   types of personalities to do those things, and Lieutenant Muxo

19   knew that Sergeant Bonenberger did not have that particular

20   skill set.  Like I stated, Lieutenant Muxo was well within

21   Department policy to make the recommendation to have Angela

22   Taylor detached into the position as Assistant Academy

23   Director, and he did so for reasons totally unrelated to her

24   race.

25             Lieutenant Colonel Harris was well within policy and

1    procedure to rely on what Lieutenant Muxo felt he needed to

2    run his unit, and he did that when he received the memo from

3    Lieutenant Muxo stating that none of the parties met the

4    minimum qualifications, "but because I've worked with Angela

5    Taylor and I know her skill set and I know she can -- she can

6    perform the job in the manner in which I need her to perform

7    the job, I am requesting that she be detached."  Lieutenant

8    Muxo in accordance -- I mean Lieutenant Colonel Harris in

9    accordance with policy and procedures sent that up to Chief

10   Isom.

11         Now, Chief Isom is the Chief of Police, and I'm sure

12   we can all relate to the fact that upper management has its

13   responsibilities and the people that lead up to upper

14   management also has its responsibilities.  Chief Isom told you

15   that instead of detaching Sergeant Taylor, he decided to

16   transfer her.  He knew there was a new recruit class coming

17   in.  He knew that position had been empty for a while and it

18   needed to be filled.  In his reasoning, he included in his

19   reasoning because Angela Taylor had more time on and because

20   she had a clean record, and Chief Isom was questioned about

21   that at length.

22         THE CLERK:  Ten minutes.

23         MS. TUCKER:  Thank you.  He was questioned about that

24   at length, and he testified that he -- Sergeant Angela Taylor

25   did have a cleaner record than Bonenberger's.  No, hers wasn't

1    crystal clear, clean with nothing on it, but it was cleaner in

2    comparison to Bonenberger's.  That went on and on and on that

3    he and I sat here and talked about.

4         Ladies and gentlemen, this case comes down to

5    Bonenberger being embarrassed and being angry and being mad

6    because he didn't get a job that he felt he was entitled to

7    have.

8         Now let's talk about the damages in this case, ladies

9    and gentlemen.  Sergeant Bonenberger -- if you only listened

10   to his testimony, you would think that having the Assistant

11   Academy Director's job is a golden ladder to becoming a

12   lieutenant, but then Plaintiffs put on David Robbins, their

13   expert, and they had one of their colleagues read his

14   deposition testimony, and he testified that in addition to

15   possibly high profile jobs, you also have to take a test and

16   do well on this test.  Part of the test is objective, part of

17   the test is graded by an outside firm, and you -- and you

18   rank.  You get ranked in clusters, A, B, C, D, and when

19   Sergeant Bonenberger took that exam, he ranked in the C

20   cluster, so even had Bonenberger been in the Assistant Academy

21   Director's position, over 42 people would have had to have

22   been promoted at this stage before he could be a lieutenant.

23   This was not his golden ladder to becoming a lieutenant.  He

24   had a lot more work to do, and there's nothing, there's been

25   absolutely no evidence to say that he can't do that good work

1    from other high profile positions.

2         Like I said earlier, ladies and gentlemen, this case

3    comes down to Bonenberger being embarrassed because he had

4    told everybody; he testified everybody knew that this was his

5    dream job.  Well, ladies and gentlemen, we all may have dream

6    jobs, but if you aren't -- but if you don't have the

7    qualifications, the skill set, the personality, you can dream

8    forever.

9         Ladies and gentlemen, the Judge has not given you

10   this particular jury instruction yet, but part of the jury

11   instructions will be a verdict director, and the verdict

12   director sets out what you need -- what you need to do.  As I

13   stated, in order for you to, first of all, find the St. Louis

14   Board of Police Commissioners liable, one of the Defendants

15   also has to be liable, so the Board of Police Commissioners

16   cannot be liable by itself.

17        Lieutenant Michael Muxo.  Lieutenant Muxo did not do

18   anything against the law.  He didn't violate any policies, any

19   procedures.  He specifically testified why -- absent the color

20   of her skin -- why he requested the transfer of Sergeant

21   Taylor.

22        Lieutenant Colonel Reggie Harris told you that he had

23   never had any communications with Lieutenant Muxo regarding

24   the color of anybody's skin and what color the person needed

25   to be to fill that position.

1        And Chief Isom did what he is required to do; he did

2   what he is allowed to do under the policies and procedure by

3   the Board.  He had the responsibility to transfer personnel,

4   or the responsibility for personnel rests with the chief.  He

5   did what he had the authority to do.

6        Ladies and gentlemen, when you take this verdict form

7   back in the jury room, we ask that you find in favor of the

8   St. Louis Board of Police Commissioners, Defendant Michael

9   Muxo, Defendant Reggie Harris, and Defendant Daniel Isom

10  because Plaintiff has not proven his case.

11       And then there's another section that you would have

12  to go on down to.  Has it been proved that the Defendants

13  would not have transferred Plaintiff to the position of

14  Assistant Academy Director regardless of his race?  Lieutenant

15  Muxo told you Bonenberger was not getting that job.  There was

16  no conspiracy here.  The third issue, conspiracy -- there's no

17  conspiracy here.  Ladies and gentlemen, Angela Taylor

18  qualified for that job, and she rightly got that job.

19       We find Plaintiff's damages, actual damages -- well,

20  Bonenberger testified although he's been all -- he's had all

21  these emotional problems and all this, he hasn't seen one

22  doctor.  He testified he lost his -- his reputation has been

23  impaired and all this, but he's still getting "meets and

24  exceeds expectations" on his evaluation.  He was -- he

25  campaigned and was voted in as President of the Police

1    Officers Association.  He told you that association is an

2    association of officers, sergeants, lieutenants, lieutenant

3    colonels, and the chief, the current chief, so he hasn't lost

4    reputation with the Department.

5          And, ladies and gentlemen, of course, we ask that you

6    say there were no punitive damages here because there was no

7    discrimination.

8          Once again, ladies and gentlemen, we thank you for

9    your service.  We ask that -- as Plaintiff's counsel indicated

10   earlier -- that you use your common sense.  Please listen to

11   all of the evidence, look at the big picture, and we are

12   confident that once you do that you will return a fair and

13   just verdict.  Thank you for your attention.

14         MS. PETRUSKA:  I want to -- well, I want to grab the

15   microphone first so you can hear me.  No.  I realized I had to

16   do that.  I wasn't expecting you to.

17         I want to start by picking up on a few things you

18   heard from the Defendants' closing.  You heard that Sergeant

19   Bonenberger didn't report the discrimination, it wasn't

20   included in the grievance, but you heard him testify he didn't

21   want to throw Lieutenant Muxo under the bus when he did the

22   right thing by telling him what was really going on.  Again,

23   you get to use your common sense.  If somebody is doing the

24   right thing, you're going to want to try and protect them.

25   That's what Sergeant Bonenberger was doing, and -- and he had

Case: 4:12-cv-00021-CDP  Doc. #:  105  Filed: 12/30/13  Page: 29 of 35 PageID #: 1402

1   to stop protecting Lieutenant Muxo because the Department

2   wouldn't do the right thing.  The Defendants want you to

3   believe there's this huge time frame between the time he files

4   the grievance and the charge of discrimination, but you heard

5   testimony during the trial; it was about a month.  There's no

6   huge time frame there.  He gave the Department one chance to

7   do the right thing without throwing the dirty laundry of his

8   family out into the open, and when his family didn't do the

9   right thing, he had to do the right thing and tell everybody

10  what happened.

11          You've heard about these two different skill sets.

12  There's two different skill sets for an instructor and an

13  Assistant Director at the Academy.  Well, if there's these two

14  different skill sets, why does their own job description say

15  you need to have prior Academy experience?  I mean it doesn't

16  make sense.

17          You heard the Defendant say that the St. Louis Police

18  Officers Association presidency is a career enhancer, but you

19  heard three people testify that that's not true because he's

20  labor against management now.  I mean the white shirts aren't

21  going to be any happier with him now that he's the Association

22  President than they were with him when he told the truth about

23  what happened to him, and look at the timing of that.  He ran

24  to be President of the Association after he was illegally

25  discriminated against.  You heard his wife say he's the guy

1   that has to right the wrongs.  Ask yourself; why did he run

2   for President of the Association?  He has to right the wrongs

3   in the Department.

4        I told you when I started my argument that the

5   Defendants have an answer for everything, but the problem is

6   those answers just don't make sense, so let's talk about that

7   now.  Defendants want you to believe that Sergeant Boelling is

8   lying because Sergeant Blake Tucker is backing up his friend

9   and his boss, Lieutenant Muxo, the same boss who told you that

10  Sergeant Bonenberger is not welcome at the Academy because

11  Sergeant Bonenberger told the truth.  So can you imagine what

12  would happen to Sergeant Tucker if he'd have told the truth?

13  Sergeant Tucker says that conversations with Sergeant Boelling

14  about the Assistant Director position never took place.  If

15  you think about it, this testimony actually bolsters Sergeant

16  Boelling's testimony and her credibility.  If she was going to

17  lie to you, would she say there was a witness present for

18  these conversations?  She'd have lied about that, too.  I mean

19  why would you put a witness into the scene of a conversation

20  unless it took place?  So, you know, if she were going to lie

21  to you, she would have said, "Nope.  All these conversations

22  were just between me and Lieutenant Muxo -- no witnesses,

23  story over," but she told you, "Yeah, you know, we would --

24  we'd shoot the breeze; Sergeant Blake Tucker was there."  You

25  know, Sergeant Blake Tucker -- he is now -- and you can

1   believe this -- Sergeant Blake Tucker -- now part of the

2   ongoing conspiracy against Sergeant Bonenberger, not only to

3   discriminate against him because of his race but to cover it

4   up.  Sergeant Tucker -- simply part of the coverup.

5           You heard Lieutenant Muxo and Chief Isom testify.

6   The Academy is important to the Police Department, and it's

7   important because it lays the foundation for an officer's

8   career.  A good foundation makes for a good officer.  You

9   heard testimony, and you saw the policy.  This assignment was

10  supposed to be based on the knowledge, skills, and abilities

11  of the candidates.  Chief Isom, Colonel Harris, and Lieutenant

12  Muxo --

13          THE CLERK:  Five minutes.

14          MS. PETRUSKA:  -- all testified that they didn't even

15  know the requirements of the position.  How can you determine

16  who has the best knowledge, skills, and abilities if you don't

17  even know what the job requires?

18          THE CLERK:  Five minutes.

19          MS. PETRUSKA:  Thank you.  That's because none of the

20  decision makers needed to know what those requirements were

21  because there was only one requirement in their mind and that

22  was that she -- that the candidate be black.  They all knew

23  the race of Sergeant Taylor when she got the job.  They

24  testified to that.

25          So let's talk about those knowledge, skills, and

1    abilities.  Sergeant Bonenberger had taught at the Academy.

2    Sergeant Taylor had no Academy experience.  Sergeant

3    Bonenberger had his instructor development license.  Sergeant

4    Taylor didn't.  That was a preferred qualification for the

5    job.  Sergeant Bonenberger -- field training officer.

6    Sergeant Taylor -- not.  You heard two people testify that

7    field -- revamping the field training officer program was

8    important, but they'd pick a person who doesn't have any

9    experience in doing that?  Sergeant Bonenberger -- highly

10   decorated officer.  Sergeant Taylor -- not.  They tell you

11   those awards and commendations don't matter, but you don't

12   have to believe that because it's in the personnel files.  Why

13   would it be there if it doesn't matter.  Look at Sergeant

14   Bonenberger's appraisals against Sergeant Taylor.  Much better

15   officer, according to his own supervisors, than Sergeant

16   Taylor.

17          They want you to believe that this job was supposed

18   to go to a personality type, but that's not what their own

19   rule says.  It says it goes to the person with the best

20   knowledge, skills, and abilities.  You've met Sergeant

21   Bonenberger.  Do you have any doubt now that he had the

22   knowledge, skills, and abilities to do that job?  Do you have

23   any doubt that he was the best person for that job?  Again, it

24   just doesn't make sense.

25          They want to talk about, you know, this month or two

1   that Sergeant Bon -- or Sergeant Taylor and Lieutenant Muxo

2   worked together, but, again, it doesn't make sense.  You don't

3   pick a person -- when the requirements are knowledge, skills,

4   and abilities, you don't pick a person just because you worked

5   for them before.

6          And, again, look at what the Academy is supposed to

7   do.  You're trying to train the best officers.  You would

8   think you would want what you consider to be one of your

9   finest, best officers meeting your new recruits at the door to

10  try and teach them to be the best that they can be.  You

11  wouldn't want a person who's only even applied for the job

12  because she wants to work 9:00 to 5:00.  I mean she didn't

13  have any passion for this job.  He did.

14         Chief Isom told you, "I'm the man.  The buck stops

15  with me."  You also heard him testify -- it was kind of

16  surprising -- that he didn't want to transfer her to the

17  position and then assign her or -- I'm sorry -- detach her and

18  then assign her a year later because that would look like

19  smoke and mirrors.  Well, he's right.  It did look like smoke

20  and mirrors, but actually transferring Angela Taylor to the

21  position when she had no experience and no qualifications,

22  never taught a single class at the Academy -- that didn't just

23  add smoke to the situation; that exposed the fire, and the

24  fire here is illegal discrimination.

25         You heard him testify -- you heard Chief Isom

1    testify, "I picked -- I picked Taylor because she had more

2    time in rank."  Not true.  "She had a clean disciplinary

3    record."  Not true.  He said, "I've been a police officer for

4    forever.  I know how important it is to get these things

5    right," but now he has an explanation for why he got it wrong,

6    but you saw how easy it was to get it right.  All he had to do

7    was look at the applications.

8               THE CLERK:  One minute.  One minute.

9               MS. PETRUSKA:  Thank you.  In closing, I want to say

10   two things.  Jimmy Carter said, "I say to you quite frankly

11   that the time for racial discrimination is over.  If you don't

12   like Democrats, here's a Republican, Rand Paul."  I'm not in

13   favor of discrimination in any form.  It doesn't matter your

14   politics.  Discrimination in this country is wrong.  It's

15   wrong to ruin somebody's career.  You heard them say that he

16   could still compete for this sergeant's or this lieutenant's

17   exam.  He's never going to be a lieutenant.  He's in the C

18   cluster.  It's a subjective test.  Half of the people that

19   grade that test are on the Department.  He's going nowhere.

20   What you need to do here is -- he said -- he said to you --

21   his wife said to you -- "I right wrongs.  I get the bad guys."

22   You need to get the bad guys.  You need to give him some --

23               THE CLERK:  Time.

24               MS. PETRUSKA:  Thank you.

25         (Excerpted proceedings ended at 11:47 a.m.)

<u>CERTIFICATE</u>

     I, Gayle D. Madden, Registered Diplomate Reporter and Certified Realtime Reporter, hereby certify that I am a duly appointed Official Court Reporter of the United States District Court for the Eastern District of Missouri.

     I further certify that the foregoing is a true and accurate transcript of the proceedings held in the above-entitled case and that said transcript is a true and correct transcription of my stenographic notes.

     I further certify that this transcript contains pages 1 through 34 inclusive.

     Dated at St. Louis, Missouri, this 30th day of December, 2013.

_____

/s/ Gayle D. Madden

GAYLE D. MADDEN, CSR, RDR, CRR

Official Court Reporter