**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI**

DAVID BONENBERGER,

      Plaintiff,

      vs.           Cause No. 4:12CV-21CDP

THE ST. LOUIS METROPOLITAN
POLICE DEPARTMENT, et al.,

      Defendants.
========================================================
TRIAL TRANSCRIPT OF TESTIMONY OF:
SGT. DAVID BONENBERGER AND SGT. DEBORAH BOELLING

**BEFORE THE HONORABLE CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE**

AUGUST 19, 2013, VOLUME 1
========================================================

APPEARANCES:

For Plaintiff:

Ms. Lynette Petruska
Ms. Brandy Barth
2010 S. Big Bend Blvd.
St. Louis, MO 63117


For Defendants:

Ms. Dana Tucker
Mr. Christopher Hoell
Attorney General's Office
P.O. Box 861
St. Louis, MO 63188

Reported by:

Lisa M Paczkowski, CCR, RPR
Official Court Reporter
United States District Court
111 South 10th Street
St. Louis, MO 63102

1                              INDEX

2

3
   Plaintiff's Witnesses:
4
   Sgt. David Bonenberger
5
        Direct Examination....................... 1
6        Cross Examination......................... 68
         Redirect Examination...................... 95
7
   Sgt. Deborah Boelling
8
         Direct Examination.......................100
9        Cross Examination........................109

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>**AUGUST 29, 2013**</u>

1

2          (Voir Dire and Opening Statements were had,

3  but not transcribed.)

4          THE COURT:  All right, plaintiffs may proceed

5  with their evidence.

6          MS. PETRUSKA:  Thank you, plaintiff calls

7  Sergeant David Bonenberger.

8          THE COURT:  All right, sir, would you step

9  down here for the clerk to swear you in.  You can

10  proceed.

11          MS. PETRUSKA:  Thank you, your Honor.

12                  <u>**SGT. DAVID BONENBERGER**</u>,

13  being produced and sworn, testified as follows:

14                  <u>**DIRECT EXAMINATION**</u>

15  BY MS. PETRUSKA:

16      **Q.**  I know you stood, pointed, etc., to

17  acknowledge yourself.  Can you now formally introduce

18  yourself to the jury?

19      **A.**  David Bonenberger.

20      **Q.**  Where are you currently employed?

21      **A.**  The St. Louis Metropolitan Police Department.

22      **Q.**  And how long have you been employed by the St.

23  Louis Police Department?

24      **A.**  Just under 20 years.  I started there as a

25  recruit in training on October 11, 1993.

1      Q.   What's your current rank in the department?

2      A.   I'm a Sergeant.

3      Q.   When were you promoted to Sergeant?

4      A.   March 18, 2009.

5      Q.   Can you explain to the jury your educational

6   background?

7      A.   I have a Batchelor's Degree in Business

8   Management with a minor in Economics.

9      Q.   Where did you receive that degree?

10      A.   Webster University.

11      Q.   When did you receive that degree?

12      A.   2001.

13      Q.   In your 20 years as police officer, could you

14   briefly list your assignments with the department?

15      A.   Certainly, upon graduation from the police

16   academy in February of 1994, I was assigned to District

17   3.  I spent just under five years there.

18           I was then transferred to District Number 5.

19   I spent just under five years there, and was

20   transferred to the Housing Unit, which is a uniformed

21   division that patrols the public housing complexes.

22           From that assignment, I went into the police

23   academy as an instructor for a little over a year.

24   While I was at the Housing Unit, I had also been

25   detached to the Anti-Crime Division for a short period

4

1    of time, which is a plain clothes assignment.

2          Following removal from the police academy, I

3    was transferred to District 2 for three weeks.  Then

4    promoted to Sergeant.  I spent the last four and half

5    -- little over four and half years as a street Sergeant

6    in District 6.

7          **Q.**   When you said you were an officer in District

8    3 and 5, at the beginning of your career, does that

9    mean you were a patrol officer?

10         **A.**   Yes, uniformed patrol officer.

11         **Q.**   What are the duties, if you can explain just

12   briefly to the jury, the duties of a uniformed patrol

13   officer?

14         **A.**   Answer radio calls you are dispatched to,

15   writing corresponding necessary incident reports,

16   patrol to various areas that you are assigned to as a

17   crime deterrent, visual deterrent, on crime.

18         From time to time, you would have to affect

19   arrests of law violators.  Basically, just help

20   citizens if they are in need at the time of crisis when

21   they call for assistance.

22         **Q.**   Anything else you want to add before we move

23   on?

24         **A.**   I also had a different duty when I was in the

25   third district.  I was a field training officer.  I was

1    certified as a driver's training instructor.

2        **Q.**   Those were additional duties you had to being

3    a patrol officer; is that correct?

4        **A.**   That's correct.   Those are additional.

5        **Q.**   Could you briefly describe to the jury what

6    your duties were in the housing unit?

7        **A.**   Essentially the same as the district, except

8    that it was to cover the four public housing complexes

9    in the City of St. Louis.

10       **Q.**   How about the Anti-Crime Division, what did

11   you do in the Anti-Crime Division?

12       **A.**   The Anti-Crime Division was a division that

13   was a plain clothes operation.   You worked in covert

14   vehicles, for lack of a terminology, undercover cars,

15   not marked police cars, things people wouldn't readily

16   identify as police cars.

17            You look for violent crimes in progress,

18   stolen automobiles was the focus, and try to affect the

19   arrest of people committing the crimes in progress, and

20   I was also the acting supervisor when my immediate

21   supervisor was not there; or otherwise, indisposed as I

22   was in District 5, in the Housing Unit as well.

23       **Q.**   Before I have get into the academy, I know it

24   jumps in your chronological service, but what do you do

25   currently as a Sergeant in the district?

1    **A.**   I supervise -- immediately supervise seven

2    patrol officers that are assigned to my precinct.

3    There are three other precincts in the district that

4    have seven officers assigned -- seven or eight, if I

5    remember correctly, at any given time; not only do I

6    supervise my immediate subordinates, but also other

7    officers that are working, insure that they follow

8    rules, regulations, policies, procedures, State law,

9    review the reports, make sure that they are prepared

10   for duty in proper uniform.  That they are following

11   all of those policies and procedures.

12        I conduct annual performance appraisals of the

13   seven officers -- or any officers that are directly

14   assigned to me.  I also patrol the street, and assist

15   the radio calls to help the citizens out.

16   **Q.**   Anything else you want to add before I move

17   on.  I am just checking?

18   **A.**   Not that I can think of.

19   **Q.**   Let me ask you this way, as a street sergeant,

20   do you have any kind of accounting responsibilities?

21   **A.**   No, I don't.

22   **Q.**   I want to focus on the academy now.  First,

23   when were you assigned to the academy?

24   **A.**   I believe it was January of 2008.

25   **Q.**   How long were you there?

1    **A.**    Just over a year.  I was transferred out of

2    the academy in late February of 2009.

3        **Q.**    Who assigned you to the academy?

4        **A.**    The Chief of Police.

5        **Q.**    What were your duties when you were assigned

6    full-time to the police academy?

7        **A.**    I was responsible for court curriculum

8    instruction primarily for the recruits in training.  I

9    specifically taught the patrol block, which is

10   essentially teaching the recruits what the aspects are

11   of patrolling in the city, in the department.

12        I also taught the driver's training.  I was

13   responsible for the coordination of that program.  I

14   did the practical application block, which is role

15   playing, with the recruits, trying to put them in mock

16   situations that they may encounter on the streets.  How

17   they deal with that.

18        I also taught firearms at the firearms range.

19   I was instrumental in the department in purchasing a

20   driving simulator.  Currently, I was the only one, to

21   my knowledge, certified to instruct on that apparatus.

22   I authored and wrote the post-approved current driver's

23   training block.  I believe they still use it.

24        I also authored the current inservice training

25   tactical car stop, tactical vehicle stop block.  That's

8

1 continuing education.  The instructors at the academy

2 also have the continuing education classes for current

3 police officers on the street.  We have to meet a

4 minimum threshold of a certain amount of training

5 hours.  We have inservice for a three-year period going

6 forward.

7   I also taught the active shooter class while I

8 was in the academy.  That had been authored by the

9 assistant director at the time.  I also did the -- we

10 have a firearms simulator that's called the rapture

11 laser shot 2000.  It is a video with a photo sensor.  I

12 don't know what the proper terminology is, but it has

13 two beams of light instead of bullets that targets on

14 the screen.  It is a whole training block.  People go

15 through that.  I authored that.  I don't know if they

16 still use it or not.  That's about it.

17 **Q.**  I want to make sure I'm clear.  So based on

18 your testimony, is it my understanding that you taught

19 both new recruits and seasoned officers?

20 **A.**  Yes, it is.  It wasn't just patrol officers.

21 There was members of all ranks that had to go to

22 continuing education class.  Some of them were

23 electives that people signed up for.

24 **Q.**  Did you have any kind of special duties with

25 respect to any classes -- new recruit classes at the

1    academy?

2         **A.**   When I was there, I was assigned to the

3    supervisor of class 0804, which instructors typically

4    has the assignment role of being the class supervisor,

5    where we are responsible for all of the logistics of

6    the class.

7         **Q.**   Anything else that you did as a class

8    supervisor before I move on?

9         **A.**   Basically, you supervise the entire academy

10   class.  If there is 40 recruits in the class, you are

11   responsible for that class.  You are responsible to

12   make sure all of the paperwork for the recruits, all of

13   their logistical issues are in order.  Without going

14   into what all the logistics are, there is a lot of

15   forms, paperwork, you have to sign up for benefits,

16   make sure beneficiaries are correct.  Insure they all

17   have driver's licenses so on, so forth, to make sure

18   that everything is in order.  You are responsible for

19   that class up until the point they graduate.

20        **Q.**   So it sounds like you had administrative

21   duties with the class you supervised?

22        **A.**   Absolutely.

23        **Q.**   And other than what you have already described

24   what you did that year, you were a full-time instructor

25   at the academy, have you taught any other classes

1    through the academy?

2        **A.**   Yes, I was first certified as a driver's

3    trainer in December of '96.  So shortly after that, I

4    began teaching recruits, driver's training through the

5    academy, while I was still in the district as an

6    adjunct instructor.

7            I also taught and recertified people in the

8    use of the taser, the electromagnetic sound device,

9    that's used for a less forced option.

10           I also taught the ETS equipment, which is a

11   basically a bait car.  I don't know if anybody is

12   familiar with bait cars on the jury.  You put an

13   electronic beacon, electronic monitoring device on the

14   vehicle or other apparatus.

15           If it is tripped, you track it.  I also

16   instructed on the spike strips, the tire inflation

17   device.

18       **Q.**   So have you been teaching somewhat

19   continuously through the academy since 1996?

20       **A.**   Yes, ma'am.

21       **Q.**   And what certifications do you have to teach

22   at or through the academy?

23       **A.**   I hold currently still a Missouri State

24   generalist instructor certificate, which allows me to

25   teach through the State of Missouri in any training

1    academy.  I also have a driver's trainer instructor

2    certification from the safety service center that I

3    received in September of '96.

4            I also have a Department of Homeland Security

5    driver's training instruction certificate I received in

6    2008 from the Federal Law Enforcement Training Center

7    in Glenco, Georgia.

8            I am also certified in taser instruction with

9    respect to deployment and UTS equipment.

10       **Q.**  Who paid for all of the certifications?

11       **A.**  The department, I believe.

12       **Q.**  It sounds like you have been doing the

13   driver's training the longest; is that correct?

14       **A.**  Yes.

15       **Q.**  With respect to the driver's training, is that

16   only to new recruits, or does that also involve

17   experienced officers?

18       **A.**  It also involves the current experienced

19   officers in two ways.  If you have the misfortune of

20   being involved with a department accident with a police

21   vehicle, department vehicle, there is a board that's

22   called the Department Accident Review Board.  They pass

23   a ruling on whether or not you are at fault, for a lack

24   of a better terminology.

25           It is called a chargeable or nonchargeable

1    accident.   Nonchargeable, being basically they didn't
2    do anything wrong, or whatever the circumstances are.
3    Chargeable being like where you are at fault, or there
4    was some issues that have to be addressed.
5          So what the department does is they have
6    people that have had chargeable accidents go through a
7    driver refresher course, and I was responsible for
8    teaching that from time to time.
9          And also a few years ago, the department
10   initiated an inservice driving class for all inservice
11   police officers, not as a punitive thing, but a
12   refresher for training.  I was utilized to conduct
13   those classes as well.
14       **Q.**   You said that was in the last two to
15   three years, if I remember correctly?
16       **A.**   If my memory serves me correct, yes, ma'am.
17       **Q.**   Okay.  Would it be fair to say that based upon
18   your own experience and training, that you had a number
19   of opportunities to observe the various instructors at
20   the academy?
21       **A.**   Yes, I would say that.
22       **Q.**   How many years have you had an opportunity to
23   observe or watch how the academy is being run?
24       **A.**   Since I was first utilized, was a driver's
25   training instructor, after I received the certification

13

1    in December -- I'm sorry, excuse me, December of 1996.

2        **Q.**    Based upon your own experiences and training

3    and opportunities said, would you believe that you

4    would be able to effectively evaluate those that are

5    responsible for training at the academy?

6            MS. TUCKER:   Your Honor, I object.   That calls

7    for speculation.

8            THE COURT:   I'm going to overrule it.   I'm not

9    sure exactly why you are going there.   I'll allow you

10   to answer this one.

11           THE WITNESS:   I believe I would, ma'am.

12       **Q.**    (By Ms. Petruska)   And why do you believe you

13   would be able to effectively evaluate officers at the

14   academy -- I'm sorry, instructors at the academy?

15           MS. TUCKER:   I object, once again, relevance,

16   speculation.

17           THE COURT:   Overruled.

18           THE WITNESS:   Because I have been involved

19   with training.   It has been my passion, while on the

20   police department, I have been directly involved with

21   teaching since late 1996.   I have been an instructor at

22   the academy.   I have been a driver's training

23   instructor.   I have seen the instructors that do the

24   inservice training.   I have been through the classes.

25   I have taught the classes.   So I think I would

1    definitely do that.

2        **Q.**   You mentioned earlier that one of your extra

3    duties, while you were a police officer, was being a

4    field training officer; is that correct?

5        **A.**   Yes, ma'am.

6        **Q.**   Could you explain to the jury what a field

7    training officer is or does?

8        **A.**   Sure, a field training officer is the first

9    line of training once you graduate from the police

10   academy.  Every recruit, once they pass the basics of

11   the teaching academy, are assigned to a field training

12   officer in the district that they are assigned, and it

13   is your responsibility, as a field training officer, to

14   properly train the newly graduated recruits, the new

15   police officers, how to be a police officer.  Insure

16   they follow the proper procedures, proper rules, follow

17   the laws obviously.

18          For lack of terminology, hold their hand for

19   the first several weeks, since they have embarked on

20   this new career.  You are specifically responsible for

21   evaluating them.  You have to complete evaluations of

22   these recruits that just graduated as police officers,

23   and you have to insure that they are the best they can

24   be.

25          You know, we want the best police officers.  I

1    might be a little harsh on people, because I demand

2    what was demanded of me.  I want them to be as --

3    that's not what you really asked me, I apologize.

4         THE COURT:  Let her ask you a new question.

5     **Q.**  (By Ms. Petruska)  Okay.  Anything else you

6    would describe as duties as a field training officer?

7     **A.**  Frequently as a field training officer, you

8    would be asked to supervise recruits or situations

9    until the sergeant got there.

10         The field officers, infield trainers look to

11   you as the teacher as like you do in school.  You have

12   questions about something, you ask your teacher.  There

13   is times when you would train more than one new

14   officer.  You may have two or three officers riding

15   with you and teaching them during the same eight hour

16   shift.

17    **Q.**  How long did you serve as a field training

18   officer?

19    **A.**  Sometime in 1997, I believe it was earlier,

20   mid '97, when I was first certified as a field training

21   officer, and I served in that capacity up until the

22   time I was transfer to the Housing Unit which was

23   February of 2003.

24    **Q.**  Is there any particular reason that you were

25   transferred to the Housing Unit and ended your time as

1    a field training officer?

2        **A.**   It didn't end my time as a field training

3    officer.  I maintained my field training officers

4    status.  The reason I didn't train any new police

5    officers while assigned to the Housing Unit was because

6    the Housing Unit was a specialized unit that there were

7    finite parameters on who could be assigned there, and

8    newly graduated recruits to be field trained would not

9    be assigned to a Housing Unit.

10           I kept my field training status up until the

11   time I was promoted in 2009.

12       **Q.**   Are sergeants allowed to be field training

13   officers?

14       **A.**   I don't know if allowed is the right term, but

15   supervisors are not field training officers.  They are

16   supervisors.

17       **Q.**   How is it that you were selected or got the

18   position of field training officer?

19       **A.**   I was asked.

20           MS. TUCKER:  Your Honor, may I please object

21   as to relevance and speculation.

22           THE COURT:  Sustained.

23       **Q.**   (By Ms. Petruska)  You said you were an

24   instructor at the academy for about a year; is that

25   correct?

1      **A.**   That is correct.

2      **Q.**   When you were at the academy, did you have

3   contact with the Chief and Lieutenant Colonels?

4      **A.**   From time to time.

5      **Q.**   How often would that occur?

6      **A.**   Maybe once a week or once every couple of

7   weeks.

8      **Q.**   How would it come about that you would have

9   contact with the Chief and Lieutenant Colonel at the

10  academy?

11     **A.**   They would come by the academy from time to

12  time to check on status, see how things were going, ask

13  about the recruit classes, ask if just about issues as

14  far as equipment resources, things of that nature.

15     **Q.**   When you were a street officer, did you have

16  any contact with the Colonel rank staff at the

17  department?

18     **A.**   Very rarely.

19     **Q.**   And as an instructor at the academy, did you

20  have contact with the Board of Police Commissioners?

21     **A.**   Yeah, from time to time, but it was only to

22  say, acknowledge, say hi, when there was graduations

23  occurring.

24     **Q.**   As a street officer, did you ever see the

25  Board though?

1      **A.**   Never.

2      **Q.**   Let me -- I'm not sure I clearly

3   differentiated this.  You are now a Sergeant?

4      **A.**   Yes, ma'am.

5      **Q.**   As a Sergeant on the street, does it give you

6   access to the Colonel staff, now that you are a higher

7   rank?

8      **A.**   No, only in extraordinary circumstances.

9      **Q.**   If you would have gotten the position of

10  Assistant Academy Director, would you have considered

11  that a promotion?

12          MS. TUCKER:  I object, relevance and

13  speculation.

14          THE COURT:  I'm going to let him testify to

15  this.  This is a contested issue in the case.  He can

16  testify, go ahead.

17     **Q.**   (By Ms. Petruska)   The question before you is

18  would you have considered -- if you would have gotten

19  the Assistant Director position, would you have

20  considered it a promotion?

21     **A.**   Yes.

22     **Q.**   Why is that?

23     **A.**   It is a high-profile position.  The Assistant

24  Director is not only responsible for teaching, but also

25  all of the administrative duties that come with running

1    the operational dynamics of the training facility.  The

2    training academy is the first step in your career as a

3    police officer.  I believe it to be the most important

4    step.

5         With that, if you're tasked with or given the

6    greater responsibility of seeing to it that that

7    operational dynamic is best, you are going to have an

8    opportunity to come in contact with command rank

9    officers, Captains and above Captains, Colonels, Chief,

10   that are going to get an opportunity to see how your

11   work ethic is, and how you work.

12        If they are impressed by that, if you do what

13   they think is the best thing, and succeed you have --

14        MS. TUCKER:  Your Honor, could I please object

15   to the witness going on and on.

16        THE COURT:  Sustained.  It is getting -- this

17   has to be in question and answer form.  He is going on

18   and on.

19   **Q.**  (By Ms. Petruska) Any other reasons that you

20   would consider the assignment to the academy, Assistant

21   Academy Director position a promotion?

22        MS. TUCKER:  Once again, your Honor, I object

23   to the relevance.

24        THE COURT:  Overruled.

25   **Q.**  (By Ms. Petruska)  If there is anything you

20

1    want to add, just add it now?

2        **A.**   No.

3        **Q.**   Sergeant Bonenberger, how did you learn about

4    the opening of the Assistant Academy Director position?

5        **A.**   I read it on a department distributed e-mail.

6        **Q.**   Let me show you --

7            THE COURT:   The jury can see both of the

8    monitors.  It has been admitted.  That's fine.

9            MS. BARTH:   This monitor is off.

10            THE COURT:   The big monitor is not working.

11    Did it come on.  It worked earlier this morning when we

12    tested it.

13            MS. PETRUSKA:   There it goes.

14            THE COURT:   Now, the other one is not on.

15    That happens.  We test it right before the jury trial

16    starts, and then the first time we use them, they don't

17    work.  Then they will work after that.

18            Many of these exhibits have been received into

19    evidence.  If you seeing it, it is in evidence.  I'm

20    not going to tell you otherwise.  Okay, go ahead, Ms.

21    Petruska.

22            MS. PETRUSKA:   Thank you, your Honor.

23        **Q.**   (By Ms. Petruska)  Actually, I want to direct

24    your attention to the second page of Exhibit 2, and ask

25    you if that describes the job duties of the Assistant

1    Academy Director.  At least, when the position was

2    posted?

3        **A.**   Yes.

4        **Q.**   Then as I go down further, on that e-mail,

5    that further describes the minimal requirement for the

6    job; is that correct?

7        **A.**   Yeah, at the time it was posted, it does.

8        **Q.**   Do you recall when that position was posted?

9        **A.**   I believe it was September 24, 2010.

10       **Q.**   And what did you do when you learned that the

11   Assistant Academy Director position was open?

12       **A.**   I called Lieutenant Muxo.

13       **Q.**   And I know the jury has met Lieutenant Muxo as

14   well, but describe to the jury who Lieutenant Muxo is?

15       **A.**   He is the director of the academy.  He was

16   then.  He is today.

17       **Q.**   Did you know Lieutenant Muxo when you called

18   him about the Assistant Director position?

19       **A.**   Yes.

20       **Q.**   How did you know Lieutenant Muxo?

21       **A.**   When I went through the academy in '93, he was

22   the defensive tactics training instructor at the

23   academy; and throughout my career, we had had occasion

24   to interact in a professional job-related capacity.

25       **Q.**   Do you know when you called Lieutenant Muxo?

1        **A.**   I don't know the specific date.

2        **Q.**   Do you know if it was before or after you

3    applied for the position?

4        **A.**   It was before I applied for the position.

5        **Q.**   And why did you call Lieutenant Muxo?

6        **A.**   Well, I knew that I didn't have the three

7    years supervisor experience in my rank, and it was the

8    job that I always wanted, and I thought I would call

9    him and see if my acting Sergeant capacity in the past

10   and all of my experience would allow for superseding

11   that requirement.

12          I know in the past, that the department has

13   transferred people into the jobs that didn't meet the

14   minimum requirements as they are supposed to.

15       **Q.**   Any other purpose for calling him?

16       **A.**   No, just to get a feel for it.

17       **Q.**   What did Lieutenant Muxo tell you when you

18   asked about the open Assistant Academy Director

19   position?

20       **A.**   He told me not to bother applying for it,

21   because the job was going to a black female.

22       **Q.**   What did you do when Lieutenant Muxo told you

23   that the position was going to a black female?

24       **A.**   I asked him why.

25       **Q.**   And did he tell you why?

1    **A.**   Yes.

2    **Q.**   What did he tell you?

3    **A.**   He told me that it was out of his hands.  That

4    it was not his decision, and Colonel Harris would make

5    the decision.

6    **Q.**   Was there anything else involved in that

7    conversation about the Assistant Academy Director

8    position?

9    **A.**   There may have been some other talk, but I

10   don't recall what it was.  It was a very brief

11   conversation at that point.

12   **Q.**   How long would you say that conversation

13   lasted?

14   **A.**   Three, three to five minutes maybe.

15   **Q.**   Did you tell anyone at the department about

16   your conversation with Lieutenant Muxo?

17   **A.**   I told my wife.

18   **Q.**   And when did you tell her?

19   **A.**   Right after the phone call.

20   **Q.**   Did you tell anybody else besides your wife,

21   within the department, about that particular

22   conversation?

23   **A.**   Not directly.

24   **Q.**   When you say not directly, what do you mean?

25   **A.**   There was an e-mail that was sent to me from a

1    colleague of mine that had told me that I should put --

2    essentially actually put in for the job.  I would be

3    the best qualified for it.  I should talk to Lieutenant

4    Muxo.

5          I responded back by e-mail saying I already

6    had, and they already have somebody else picked out for

7    the job.

8    **Q.**   And I'm going to show you Plaintiff's

9    Exhibit 10, and ask you if that's the e-mail with

10   Sergeant Dandridge that you just mentioned?

11   **A.**   It is.

12   **Q.**   Does Exhibit 10 tell you, or state when you

13   sent those e-mails?

14   **A.**   It has the date of September 26, 2010.

15   **Q.**   Was that before or after you applied for the

16   position?

17   **A.**   It was before I applied for the position.

18   **Q.**   And in this first line at the top here, is

19   that what you are referencing a moment ago.  "I already

20   spoke to him," him being Lieutenant Muxo, "there is

21   somebody else already picked for the job?"

22   **A.**   Yes.

23   **Q.**   Did you apply for the open position anyway?

24   **A.**   I did.

25   **Q.**   And why did you apply for the position?

1      **A.**   Well, it was my -- I wanted to try to get the

2    job that I always wanted in the hopes that maybe

3    something would fall through with the person they had

4    picked out for it.

5      **Q.**   And when did you apply for the open position?

6           THE COURT:   If you are finished with the

7    exhibit, do you mind taking it down?

8           MS. PETRUSKA:   Certainly.

9           THE COURT:   I'm sorry, the question was when

10    did you apply for the position?

11           THE WITNESS:   It was sometime shortly after

12    that in the next few days.   I believe it was on -- it

13    was either the last few days of September or

14    October 1st.

15      **Q.**   (By Ms. Petruska)  And before I move on,

16    knowing that the position had already been -- somebody

17    else had already been selected for the position, any

18    other reasons that you decided to apply for it anyway?

19      **A.**   Like I said, it was a dream job for me, and if

20    something fell through with it, then hopefully I would

21    be considered for it.   Because it could be a career

22    builder.

23      **Q.**   Why would you consider the Assistant Academy

24    Director position a career builder?

25      **A.**   Because of the reasons I said earlier.   It

26

1    puts you in contact with upper-ranking commanders,

2    Captains and above that have exposure to you, and they

3    are the decision-makers.   They recommend you for future

4    promotions.

5        **Q.**   You have been with the department almost

6    20 years, right?

7        **A.**   Yes, ma'am.

8        **Q.**   Based on your own 20 years of experience with

9    the department, are there other assignments in the

10   department that have that same career-building ability?

11       **A.**   Certainly.

12       **Q.**   What would you consider those other

13   assignments to be?

14       **A.**   Well, obviously assignments as an instructor

15   at the academy, the Homicide Division, are regarded as

16   the best detectives you have.   The Intelligence

17   Division, they work directly for the Chief of Police,

18   and we have assignments where you can be detached to

19   Federal agencies like the FBI, the Drug Enforcement

20   Administration, and the Alcohol Tobacco and Firearms

21   Unit.

22       **Q.**   Why would you consider those particular

23   assignments to be prestigious and career-advancing?

24       **A.**   Well, to get those assignments, you are

25   regarded as the best of the best.   The best the

1   department has to offer, and you are in high-profile

2   positions conducting very complex investigations, and

3   you are -- you have exposure to higher profile

4   incidents.  It can also be very career-building, if you

5   do a good job in those assignments.

6          You are working more directly for the

7   decision-makers in the department, the Captains, the

8   Colonels, and the Chief.

9      Q.   I'm assuming -- actually, let me backup for a

10  second.  Have you put in for any other more prestigious

11  assignments?

12     A.   I have.

13     Q.   Have you gotten them?

14     A.   No.

15     Q.   Which ones did you put in for?

16     A.   Earlier in my career, I put in for the

17  Homicide Division, also as a Sergeant.  I had applied

18  for Detective, Sergeant, Homicide Division, Anti-Crime

19  Task Force is an assignment, Narcotics Division, the

20  academy.  I applied there three times before I finally

21  got the position as an instructor there.

22     Q.   I'm assuming that when you saw the position

23  posting for the Assistant Academy Director, which was

24  previously Exhibit 1, you looked at the requirements

25  for the jobs and the responsibilities of the job?

1    **A.**   Yes.

2    **Q.**   I know you testified already you didn't have

3    one of the requirements of the job, but based on that

4    posting, did you feel that you could do -- you could

5    perform the responsibilities of the job?

6    **A.**   Yes, I did, because in some -- at least one of

7    the assignments or applications I made previously, I

8    didn't meet the minimum qualifications, and they sent

9    me back a response saying I didn't meet the minimum

10   qualifications.  I wouldn't be considered for that job.

11   **Q.**   Now, I'm focussing now on the duties of the

12   Assistant Academy Director, okay?

13   **A.**   Yes.

14   **Q.**   Actually, I can put that back on there.  It is

15   my understanding what I'm now showing you as part of

16   Exhibit 1 are the essential responsibilities, not the

17   qualifications, but the responsibilities of the job?

18   **A.**   I'm sorry, I misunderstood you.

19   **Q.**   All right.  Would it be -- do you believe you

20   could have fulfilled these responsibilities?

21   **A.**   Absolutely.

22   **Q.**   Why is that?

23   **A.**   Because I have all -- I possess all of those

24   skills and abilities.  I have been an instructor at the

25   academy.  I'm able to know what it is like to be an

1    instructor there.  I can teach.  I possess a teaching

2    certificate issued by the State.  My educational

3    background is such that I'm able to do all of the

4    things.  I have overseen the daily operations of the

5    academy classes.  I have written lesson plans that have

6    been approved by the State.  I have written other

7    training agendas and apparatus.  I have met with

8    numerous people in the City, and the State, at the

9    levels that I have to.

10            I have plenty of experience with the logistics

11   and the administrative end of these things.

12       Q.   How would the duties of a street Sergeant

13   compare with the duties of the Assistant Director of

14   the academy?

15       A.   I don't think they really do.

16       Q.   How is that?  Can you explain to the jury why

17   you don't consider them a comparable position?

18       A.   You don't directly teach anyone, train anybody

19   as a street supervisor, as a Sergeant on the streets.

20   Although you do have to do some helping and coaching,

21   which you would do with anybody.

22            But in the Academy Director position, you are

23   basically running the academy, helping the Director

24   out.  In the streets, I'm running my own precinct with

25   the assistance of other supervisors and the Watch

30

1    Commander, who then answers to the Captain.

2            I don't have any direct control of the

3    operational dynamic of the platoon.  Where at the

4    academy, the Assistant Director, you would be pretty

5    much the second in charge and absolutely would be

6    governing how that operational dynamic worked out.

7        **Q.**    Anything else you want to add before I move

8    on?

9        **A.**    No, ma'am.

10       **Q.**    We have already established that you applied

11   for the Assistant Director position, correct?

12       **A.**    Yes, ma'am.

13       **Q.**    Let me show you Plaintiff's Exhibit 3, and ask

14   you first if that is your application for the Assistant

15   Academy Director position?

16       **A.**    Yes.

17       **Q.**    And what did you state as your qualifications

18   for that position?

19       **A.**    Essentially everything I said earlier,

20   currently post-certified as a general instructor in the

21   State, certified by the Department of Homeland Security

22   for a driver's training instructor, taser instructor,

23   spike strip instructor, ETS instructor.

24            I was previously assigned to the academy as an

25   instructor.  Class supervisor for a class there.  I

1    taught patrol, driver's training, practical

2    application, firearms, taught the inservice training,

3    authored the blocks of training for the driver's

4    training program.  The inservice tactical vehicle stop

5    program, conducted the active shooter training, the

6    field training officer.

7         I am just very passionate about the training

8    environment, and that I want the most.  I strive for

9    the most realistic training that our officers can

10   receive with limited resources.

11        **Q.**  Essentially would Exhibit 3 be your listing of

12   why you felt you were the most qualified applicant for

13   the position?

14        **A.**  Yes, ma'am.

15        **Q.**  I believe I put Exhibit 3 up there for the

16   jury.  Your application also includes something called

17   a personal profile; is that correct?

18        **A.**  Yes, ma'am.

19        **Q.**  Is a personal profile attached to any

20   application for any position at the police department?

21        **A.**  I believe it is.

22        **Q.**  Can you explain to the jury, what is a

23   personal profile?

24        **A.**  It is basically a background of your

25   employment history.  It lists your badge number, your

1    department serial number, handcuff number, things like

2    that, your dates of service, how long you have been

3    there.  What your date of rank was.  What your

4    educational background is.  What your training

5    background is.  Basically, it is a department history.

6        **Q.**   It is a snapshot of you, at least in terms of

7    your employment with the department?

8        **A.**   Yes, ma'am.

9        **Q.**   And does a personal profile also list the

10   awards and commendations of an officer?

11       **A.**   It does.

12           MS. TUCKER:  I object to the line of questions

13   as to relevance.

14           THE COURT:  Sustained.

15           MS. PETRUSKA:  Judge, may I address that.

16           THE COURT:  Yeah, come to the bench.

17           (Proceedings were held at sidebar, outside the

18   hearing of the jury.)

19           THE COURT:  Thank you.

20           MS. PETRUSKA:  The policy for transfers talks

21   about transfer selections are supposed to be made on

22   the knowledge, skills, and ability of the officer, and

23   we believe that the awards and commendations that

24   Sergeant Bonenberger received prior to applying for

25   this position show his knowledge, skills, and abilities

1    as part of the selection process.

2         THE COURT:  Your question, does the personal

3    profile list the awards of an officer, the objection is

4    irrelevant.

5         MS. PETRUSKA:  I'm going to ask next what his

6    awards and commendations were.

7         MS. TUCKER:  Your Honor, our position is this

8    was an exhibit that the plaintiff produced to us that

9    we objected to, because I agree the promotion does talk

10   about qualifications he is awarded, and his

11   commendations don't specifically set out the

12   qualifications that she went through.  The

13   qualifications with regard to the certificates, and

14   everything else he has obtained, which establishes his

15   qualifications.

16        These awards and commendations are subjective

17   opinions with regard to specific individual incidents,

18   not necessarily whether he is fit to be or to be

19   promoted to a particular position.

20        Also during the testimony of the all of the

21   witnesses, they testified these awards or commendations

22   specifically are not considered relied upon for

23   promotion, because they are so subjective.

24        THE COURT:  I thought the objection was to the

25   form.  So it is clear, I thought the objection was to

1    that specific question.  What is on this form, which to

2    me, is a silly question.  So I was sustaining it,

3    because unless I knew some reason what's on the form is

4    particularly relevant, it is not relevant.

5            I mean, the question is whether his

6    qualifications are relevant or awards are relevant.

7    That's a different issue.  I think he is allowed to

8    testify this is a promotion case.  If he has awarded

9    honors, I think he can testify in a promotion case.

10           I want to clarify this exhibit was on the list

11   of exhibits I did receive into evidence this morning

12   without objection.

13           MS. TUCKER:  No, it was not.

14           MS. PETRUSKA:  No, your Honor, that's why I

15   wanted to lead into it, because I know.

16           THE COURT:  Has it been up in front of the

17   jury?

18           MS. PETRUSKA:  No, well the summary of them

19   through the personal profile is admitted, but these are

20   actually --

21           THE COURT:  What's the exhibit number?

22           MS. PETRUSKA:  Nine.

23           THE COURT:  Did you say the Exhibit 9?

24           MS. PETRUSKA:  I knew she was going to object.

25   I wanted to try to get it worked out before we pull it

1    down.

2              THE COURT:   Did you show it to him.

3              MS. TUCKER:   No.   She hasn't shown it to the

4    jury yet.

5              THE COURT:   You can't do it if you have an --

6    have an exhibit up on the screen.   You start asking a

7    witness does Exhibit X show whatever, but it is not

8    what you have got up on the screen.   That's misleading

9    to the jury and Judge, which is more important.

10             There is an exhibit up on the screen you are

11   asking about a different exhibit.   So you can't have

12   one in front of him and ask about a different one,

13   unless you are very clear to everyone that's what you

14   are doing.   You might want to compare them.   It is

15   otherwise misleading.   It implies to the jury you are

16   talking about another piece of the form we haven't seen

17   yet.   This is a totally different question than I

18   thought it was.

19             MS. PETRUSKA:   I did ask about the personal

20   profile.   It does include awards and commendations.

21             THE COURT:   I thought you just told me that.

22             (The proceedings returned to open court:)

23             THE COURT:   Members of the jury, we are going

24   to take a minute to discuss this.   We need to discuss

25   the exhibits and some other things outside your

1    hearing.  I apologize for making you leave.  We are

2    going to send you out to the jury room.  It shouldn't

3    be very long.  Stay in the jury room.  It may be -- I'm

4    hoping five minutes.

5             We will get this worked out, I think.  I'm not

6    understanding the lawyers very well here.

7             (At 2:30 p.m., the Proceedings stood in

8    temporary recess.)

9             THE COURT:  Go back to the lectern, okay, the

10   first thing I'm going to ask is for the clerk to please

11   put back on the screen what was on the screen before.

12   Don't let anybody move anything.  I want to see what

13   the jury was seeing, and what I was seeing.

14            Okay, this document that the jury has been

15   seeing, this document that has been shown to the jury

16   right now, or it was right before we came up and had

17   this.  What is the exhibit number on the document

18   that's on the screen right now?

19            MS. PETRUSKA:  I believe number three, Judge.

20            THE COURT:  That document has been received

21   into evidence without objection.

22            MS. PETRUSKA:  That is correct, Judge.

23            THE COURT:  What is that document, it says

24   application, and I believe you asked him, and you said

25   attached to this is your personal profile sheet.

1          MS. PETRUSKA:  That's correct, Judge.

2          THE COURT:  Now, you have asked him the

3   question through the objection was:  Does the personal

4   profile sheet show awards and commendations.  That was

5   the objection.

6          MS. PETRUSKA:  Yes.

7          THE COURT:  I don't think it is relevant what

8   is shown on that necessarily.  That's why we came to

9   sidebar.  You were going to tell me why it was relevant

10  whether a personal profile sheet has awards and

11  commendations.  I still haven't heard the answer to

12  that question.

13         MS. PETRUSKA:  I was going to use it, Judge,

14  for the foundation for him to explain to the jury what

15  his awards and commendations were.

16         THE COURT:  What is the document -- at

17  sidebar, Ms. Tucker, you told me there was an objection

18  to.  If it is not the document that's up on the screen,

19  how do I know what we are talking about.  Go back to

20  the lectern and answer the question with the mic.

21         MS. PETRUSKA:  It would be separate,

22  Exhibit 9, Judge, which is a physical copy of the

23  awards and commendations.  This would be the list.

24  That's part of the personal profile.

25         THE COURT:  So what are we fighting about.

1    Are we fighting about Exhibit 9, or about the question

2    that drew the objection, or about whether I'm going to

3    allow in evidence the fact that he has awards and

4    commendations.

5              MS. PETRUSKA:  I believe it is that.

6              MS. TUCKER:  Your Honor, it would be

7    Exhibit 9.

8              THE COURT:  Well, the plaintiff has not

9    offered or introduced it.  Are you intending to ask to

10   introduce Exhibit 9.

11             MS. PETRUSKA:  I was, yes.

12             THE COURT:  Why?

13             MS. PETRUSKA:  Just to show it.  Again, it is

14   the certificate themselves, to show the awards and

15   commendations he has received.

16             THE COURT:  Would you hand those to the clerk.

17   I want to hear your objection.

18             MS. TUCKER:  Our position is we did not object

19   to the Plaintiff's Exhibit 3, which is the commission's

20   interview sheet that they -- it was basically their

21   application.

22             THE COURT:  Right.

23             MS. TUCKER:  It does list the awarded

24   commendations.  That's that.  Now that is a separate --

25   that's a list of -- that's the actual certificate and

1    award.  It is listed here.  I don't think it is

2    relevant now to show the actual certificate and award

3    to the jury.

4          THE COURT:  Are you objecting to anything on

5    Exhibit 3?

6          MS. TUCKER:  No, ma'am.

7          THE COURT:  So she can ask him any questions

8    about Exhibit 3?

9          MS. TUCKER:  Yes.

10         THE COURT:  Okay.  So the objection to the

11    question that led us to the sidebar is overruled.  Now

12    with regard to Exhibit 9, dealing with this in advance,

13    which I didn't understand that's what we were doing.

14    But now that I do understand that's what we are doing,

15    the plaintiff wants to introduce this into evidence.

16    Why are these -- if he can testify about them, and

17    there is a list of them, why do you need to get

18    Exhibit 9 into evidence, or why do you want it into

19    evidence?

20         MS. PETRUSKA:  You know, he can testify to

21    that, but I would like the jury to have a physical

22    exhibit when they are in the jury room seeing all his

23    awards and commendations, because I don't know what

24    they are going to take notes about.

25         THE COURT:  I'm sustaining the objection.

1   These are awards of excellence, and they have a lot of

2   information that's simply not relevant; and for all I

3   know, somebody might decide well, there is all sorts of

4   awards.  They say things.  There is a certificate.

5   There is a narrative description of a bank robbery.

6   There is something he got from a crusade against crime.

7   It looks like a brochure, and they have stuff about

8   other officers as well as him, referring -- it is a

9   description, a narrative, these are not -- I don't

10  think it is relevant.

11          MS. PETRUSKA:  Judge, how would that be any

12  different from the discipline records that they want to

13  introduce.

14          THE COURT:  I don't know.  When the discipline

15  records that they want to introduce are brought before

16  me, we will discuss those at this time.  I'm not going

17  to let you have Exhibit 9.  I'm sustaining the

18  objection to Exhibit 9.

19          He can talk about what he has received.  If

20  they somehow imply that it is not true or something,

21  then I might consider it.  But I don't think all of the

22  extra stuff in these awards is --  it is cumulative,

23  and the narrative in it is not relevant to the case.

24          He can testify about his awards.  So that's

25  the ruling on the objection.  Let's take a five minute

1    break.  That way maybe we can take our afternoon recess

2    a little later than normal.  We will tell the jury five

3    more minutes.

4    (At 2:45 p.m., the Proceedings resumed in open court.)

5              THE COURT:   Thank you, members of the jury,

6    that turned into sort of an earlier afternoon recess.

7    We will probably take a short one before 5 o'clock.

8    You may continue.

9              MS. PETRUSKA:   Thank you, your Honor.

10        Q.   (By Ms. Petruska) Sergeant Bonenberger, does

11   Plaintiff's Exhibit 3, include a listing of your awards

12   and commendations from the department?

13        A.   It does.  I believe there -- it might not

14   contain them all.

15        Q.   Could you explain to the jury what awards and

16   commendations you received from the department prior to

17   applying for the Assistant Academy Director position?

18        A.   I have received a recognition award from the

19   Department, Missouri Department of Mental Health,

20   called the John J. Mactey (phonetically) award.  I have

21   received a recognition award from the Midwest Anti-Auto

22   Crime Association.

23             I have received four officers of the month, an

24   officer of the year, and I believe four department

25   awards of excellence.  Most recently, I was awarded the

42

1    medal of valor.

2         Q.   Any other awards that you can remember?

3         A.   Not that I can remember.

4         Q.   What's the criteria for receiving the medal of

5    valor?

6         A.   I really don't know.

7         Q.   So you don't know why you received it?

8         A.   Well, I received it for an incident where I

9    was involved in a shooting.  It is supposed to be for

10   extreme acts of bravery, but not to take anything away

11   from it, I didn't really do anything more than my job.

12   I was just doing what I was supposed to do.

13        It was very fortunate that somebody took

14   notice and decided to give me an award.  It is a true

15   honor, but I was just doing my job.

16        Q.   Let me ask you this way, this may cut short a

17   lot of questions.  Could you tell me the criteria for

18   any of the awards that you received, not what you did,

19   but the actual criteria for how they are awarded?

20             MS. TUCKER:  I object, speculation.

21             MS. PETRUSKA:  If you know.

22             THE COURT:  Just a yes or no question.

23             THE WITNESS:  No, I cannot.

24        Q.   (By Ms. Petruska)  I'm going to move on.  Have

25   you been evaluated in your performance as a police

1   officer?

2       **A.**   Yes, I have.

3       **Q.**   And how often are police officers evaluated by

4   the department?

5       **A.**   Annually every year.

6       **Q.**   Let me show you Plaintiff's Exhibit 8.  I

7   believe I put that up on the stand for you as well, so

8   that you could look through that without me having to

9   flip through every page for the jury.

10       Let me ask you first to identify is

11   Plaintiff's Exhibit A your employment evaluations for

12   the five years preceding your application to the

13   Assistant Director position?

14       **A.**   Yes, it is.

15       **Q.**   And let me blow this up for the jury a little

16   bit, so they can see this.  Basically a performance

17   evaluation in the department lists three rankings for

18   an Officer or Sergeant, improvement needed, meet

19   standards, or exceed standards; is that correct?

20       **A.**   Yes, ma'am, it is.

21       **Q.**   How have you been rated.  How are you rated as

22   a police officer or Sergeant in the five years

23   preceding your application to the Assistant Director

24   position?

25       **A.**   Either as meet standards or exceeds standards.

1      **Q.**   Did you ever receive an improvement needed

2    marking or rating?

3      **A.**   Never.

4      **Q.**   Would it be your position that Sergeant Taylor

5    is less qualified than you for the Assistant Director

6    position?

7            MS. TUCKER:  Objection, speculation.

8            THE COURT:  Sustained.

9      **Q.**   (By Ms. Petruska)  Did you have any other

10   communications with Lieutenant Muxo about the Assistant

11   Director position first before it was filled?

12     **A.**   I sent him an e-mail.

13     **Q.**   And do you recall what that e-mail said?

14     **A.**   I believe it said that I went ahead and filled

15   out the application and submitted it in the event that

16   something fell through with the person that they had in

17   mind.

18     **Q.**   Did you send that e-mail before or after you

19   applied for the Assistant Director position?

20     **A.**   That one would have been after I applied for

21   it.

22     **Q.**   And let me show you Plaintiff's Exhibit 11,

23   and first, first ask you if you recognize that that's

24   the e-mail you just described to the jury?

25     **A.**   Yes, I do.

1      **Q.**   And if that particular e-mail shows that you

2   sent it to Lieutenant Muxo on October 1st, 2010, at

3   3:39 p.m., would you have any reason to disagree with

4   that?

5      **A.**   No, I would not.

6      **Q.**   When you said you submitted it in case

7   something fell through with the person they have in

8   mind, have I just marked on the exhibit what you were

9   just talking about?

10      **A.**   Yes, ma'am.

11      **Q.**   Did you have any other communications with

12   Lieutenant Muxo about the Assistant Director position

13   again before it was filled?

14      **A.**   I did.  I sent him another e-mail.

15      **Q.**   What was the purpose or content of that

16   e-mail?

17      **A.**   That I hadn't heard anything about interviews

18   that were going to be conducted, and I was going out of

19   town during one of the weeks.  I thought interviews may

20   be conducted.  So I sent him an e-mail letting him know

21   that I wouldn't be available, and I wouldn't be able to

22   receive phone messages at my residence.

23        In the event that any interviews were

24   scheduled, I didn't want to be marked as a no show in a

25   message that was left at my house, and I didn't receive

1  it.

2      **Q.**   Did you ever get a call about an interview?

3      **A.**   No, I did not.

4      **Q.**   Were you ever told why you were not called for

5  an interview?

6      **A.**   No.

7      **Q.**   Did you have any communications with

8  Lieutenant Muxo about the Assistant Director position

9  after it was filled?

10      **A.**   Yeah, yes, I did.

11      **Q.**   And actually before I get into that, who would

12  be involved in a decision to appoint an Assistant

13  Academy Director?

14      MS. TUCKER:  Objection, speculation.

15      THE COURT:  Sustained.

16      **Q.**   (By Ms. Petruska) Do you know typically how

17  assignments or transfers are made in the department?

18      **A.**   Yes.

19      **Q.**   How are assignments or transfers typically

20  made in the department?

21      MS. TUCKER:  Objection, speculation.

22      THE COURT:  What's the basis for your

23  knowledge?

24      THE WITNESS:  My -- the way they have been

25  made throughout my 19 plus years on the police

1    department.

2           THE COURT:   Have you been involved in making

3    transfers and those things?

4           THE WITNESS:   No, I have not.

5           THE COURT:   I'll sustain it.

6       **Q.**   (By Ms. Petruska) When did you learn that the

7    Assistant Director position had been filled?

8       **A.**   When it was broadcast on a department e-mail.

9       **Q.**   And who filled the open Assistant Director

10   position?

11      **A.**   The Chief of Police.

12      **Q.**   I'm sorry, who was selected to be placed in

13   that position?

14      **A.**   Sergeant Angela Taylor.

15      **Q.**   And what is the race of Sergeant Angela

16   Taylor?

17      **A.**   She is African-American.

18      **Q.**   For the record, you are white, correct?

19      **A.**   Yes.

20      **Q.**   What race is Sergeant Muxo?

21      **A.**   He is Hispanic.

22      **Q.**   What race is Colonel Harris?

23      **A.**   He is African-American.

24      **Q.**   What race is former Chief Isom?

25      **A.**   He is also African-American.

1      **Q.**   Did you do anything after you learned who

2    filled the Assistant Director position?

3      **A.**   Yes, I did.

4      **Q.**   What did you do?

5      **A.**   I filed a grievance and EEOC complaint.

6      **Q.**   And you testified earlier that you applied for

7    other positions in the department before like homicide,

8    I believe, and you said some kind of Federal assignment

9    that you didn't get; is that correct?

10     **A.**   Yeah, the Federal assignment I didn't get was

11   the supervisor for the Gang Task Force detached to the

12   FBI.

13     **Q.**   Are there any other positions you have applied

14   for during your career that you didn't get?

15     **A.**   Other than the ones I mentioned, I believe

16   that covers them all.

17     **Q.**   Okay.  Did you file any type of grievance or

18   complaint when you didn't get those other positions?

19     **A.**   No.

20     **Q.**   Did any of those other positions go to

21   African-American candidates?

22     **A.**   Yes.

23     **Q.**   What positions -- what positions you didn't

24   get went to African-American candidates?

25     **A.**   I had applied for the FBI Supervisor position

49

1    twice, and on the first occasion, it went to an

2    African-American male.  When I had applied to the --

3            THE COURT:  Go ahead.

4            THE WITNESS:  --the Detective Sergeant in

5    Homicide, that went to an African-American female, and

6    I believe in the times that I have applied to the

7    Narcotics Division, Anti-Crime, there were multiple

8    openings.  So I can't say for certain that --

9            MS. TUCKER:  Your Honor, I'm going to object

10   to plaintiff speculating with regard to anything he

11   doesn't have direct knowledge on who is assigned to the

12   various positions.

13           THE COURT:  I'm confused too.  I thought you

14   said the only two you applied for were the homicide and

15   the Gang Task Force.  Didn't he just testify to that?

16           MS. PETRUSKA:  I think I said that, and he

17   responded that there were others that he had mentioned

18   earlier.  I can clarify that.

19       **Q.**  (By Ms. Petruska) Why don't you list all of

20   the positions you applied for, and you didn't get again

21   to avoid any confusion?

22       **A.**  Sure.  The FBI Gang Task Force Supervisor, the

23   Detective Sergeant in Homicide, as well as when I was a

24   patrol officer, I applied for the Detective position

25   there, Anti-Crime Division, the academy on three

50

1    different occasions, prior to the fourth time, when I

2    received it, the Intelligence Division, and the

3    Narcotics Division, I believe.

4        Q.   And you testified that on at least two of the

5    occasions, an African-American candidate was selected

6    over you; is that correct?

7        A.   Yes, ma'am.

8        Q.   Let me show you Plaintiff's Exhibit 13, and

9    ask you if that is the grievance you filed after you

10   didn't get the Assistant Director position?

11       A.   Yes, ma'am.

12       Q.   I want to particularly direct your attention

13   to the section of your grievance that talks about a

14   fair solution to my grievance is, do you see that?

15       A.   Yes, ma'am.

16       Q.   Do you also see in the fair solution to my

17   grievance is that you asked for:  "Grant me an

18   interview for the position with a member of the EEOC

19   present during the interview?"

20       A.   Yes, ma'am.

21       Q.   And did you also request that the department

22   conduct fair and unbiased interviews with qualified

23   candidates with a member of the EEOC present during all

24   of the interviews?

25       A.   Yes, ma'am.

1    **Q.**   Can you explain to the jury why you made that

2    request in your grievance?

3    **A.**   Because I believed that I had been

4    discriminated against.

5    **Q.**   Why is it that you believed you had been

6    discriminated against?

7    **A.**   Because I was told by Lieutenant Muxo that I

8    shouldn't bother filling out an application for the

9    job, because it was going to a black female.

10   **Q.**   Did you put Lieutenant Muxo and what he told

11   you in the grievance?

12   **A.**   No, I did not.

13   **Q.**   Can you explain to the jury why you didn't put

14   what Lieutenant Muxo told you in Plaintiff's

15   Exhibit 13?

16   **A.**   When Lieutenant Muxo told me what he had told

17   me, I believed he was being as truthful and honest with

18   me as he could be, and I didn't want him to fall under

19   -- I knew it would -- making this complaint would throw

20   him under the bus, so to speak.  I wanted to minimize

21   that as much as I possibly could.

22           When somebody is honest with you about

23   something of this nature, it is very difficult to make

24   a decision to address it; and like I said, I think

25   Lieutenant Muxo was being honest and truthful with me.

1    I wanted him to not have to fall under, or fall under

2    as little scrutiny as possible from the department.

3        **Q.**   Any other reason that you didn't put in what

4    Lieutenant Muxo told you in Exhibit 13?

5        **A.**   I wanted to give the police department a

6    chance to right this, to make it right, didn't want to

7    embarrass the police department, or let them embarrass

8    themselves anymore than they already had.

9        **Q.**   Did you ultimately set forth what Lieutenant

10   Muxo told you in any kind of complaint or grievance?

11       **A.**   In the EEOC complaint, I did.

12       **Q.**   Why did you include it in your EEOC complaint?

13       **A.**   Because the department did nothing to address

14   what had occurred, and I had to take it to the next

15   level.

16       **Q.**   And before I move on in terms of the response

17   to the grievance, when you had -- when you had not

18   gotten other jobs before, that had gone to

19   African-American candidates, did you file any grievance

20   or EEOC complaint with the department about those

21   positions?

22       **A.**   No, never.

23       **Q.**   Did you receive a response to your grievance?

24       **A.**   Yes.

25       **Q.**   And do you recall when you received the

1    response to your grievance?

2        **A.**   I believe it was six or seven days after I

3    filed it.

4        **Q.**   And how did you receive a response to your

5    grievance?

6        **A.**   I was called by a member of the Human

7    Resources Division and asked to come to the Human

8    Resources Division for a response.

9        **Q.**   What did she tell you about your grievance?

10            MS. TUCKER:   Objection, hearsay, your Honor.

11            THE COURT:   Overruled, overruled.

12            THE WITNESS:   The Human Resources person told

13   me that the Chief Isom had responded to my grievance in

14   an e-mail.   She read it to me while I was sitting in

15   her office, and it said essentially that the Chief Isom

16   made a transfer based on the fact that Sergeant Angela

17   Taylor had more time and rank, and that she had a clean

18   disciplinary background.

19       **Q.**   (By Ms. Petruska)  And let me show you -- I

20   understand you said it was read to you.  You didn't see

21   it that day, but is Exhibit 47, essentially what Ms.

22   Hicks told you that day in her office?

23            THE CLERK:   Judge, that's not in evidence.

24            THE COURT:   That's not in evidence, what

25   Exhibit 47?

1            THE CLERK:   47.

2            MS. PETRUSKA:   It is or isn't.

3            THE COURT:   It is not.  You can show it to

4    him, if you want to.  Is it the same as Defendant's

5    Exhibit B?

6            MS. PETRUSKA:   It is, your Honor.

7            THE COURT:   Can 47 be received without

8    objection.  Can Exhibit 47 be received without

9    objection?

10            MS. TUCKER:   Yes, your Honor.

11            THE COURT:   So 47 is received.  You can show

12    it again.

13            MS. PETRUSKA:   Thank you, your Honor.

14       Q.   (By Ms. Petruska)  Let me direct your

15    attention again to Exhibit 47, and ask you if that's

16    essentially what's contained in Exhibit 47 is

17    essentially what Ms. Hicks told you orally?

18       A.   Yes.

19       Q.   And what did you do when Ms. Hicks read you

20    the Chief's response to the grievance?

21       A.   I told her that it was inaccurate.  That

22    Sergeant Taylor and I had been promoted on the exact

23    same day, and that she did not have a clean

24    disciplinary background.

25       Q.   Was there anything else that you considered

1    inaccurate about Exhibit 47?

2        **A.**  I believe that was it.

3        **Q.**  Okay.  I'm going to show you what has been

4    marked as Plaintiff's Exhibit 2.  That appears to be a

5    memo dated March 18, 2009, naming promotions; is that

6    correct?

7        **A.**  Yes.

8        **Q.**  Does Exhibit 2 -- I know I'm going to have to

9    flip to the second page, but does Exhibit 2, show what

10   you have previously testified to that you, and Sergeant

11   Taylor, were promoted on the same date?

12       **A.**  Yes, it does.

13       **Q.**  I started to ask this a minute ago.  I want to

14   get back to it.  After the Assistant Director position

15   was filled, did you have any other conversations with

16   Lieutenant Muxo about it obviously?

17       **A.**  Yes.

18       **Q.**  And do you know when that occurred?

19       **A.**  I believe it was October 30, 2010.

20       **Q.**  And how did that particular conversation come

21   about?

22       **A.**  I was on the scene of a possible barricaded

23   subject in District 8.  Lieutenant Muxo had called my

24   cellphone.  I couldn't get the call, and then there was

25   some officers on the scene that told me that Lieutenant

1    Muxo was looking for me to speak with me, and I -- we

2    made occasion to meet up.  We had a conversation,

3    physical conversation.

4        Q.   And can you describe to the jury -- let me ask

5    you first, set the scene for the conversation, were you

6    in front of other officers, were you by yourself, how

7    physically did the conversation take place?

8        A.   There were several other officers.  I believe

9    it was after the incident had been secured, and he

10   sought me out, and we spoke briefly, and he asked to

11   speak with me privately.  So we began walking up an

12   alley, away from the other officers that were at the

13   location.

14       Q.   As far as you could tell, could anybody else

15   -- as far as you could observe, could anybody else hear

16   your conversation?

17       A.   I don't believe so.

18       Q.   And what did Lieutenant Muxo tell you about

19   the Assistant Director position on October 30, 2010?

20       A.   He told me that he had no choice.  That he had

21   to bring color down to the academy.

22       Q.   And did he tell you anything else?

23       A.   That it was Colonel Harris' decision, and that

24   I should keep doing what I am doing with the driver's

25   training.  That he would try to create a position for

1    me at the academy.

2        Q.   How long did that particular conversation

3    last?

4        A.   Not very long, three, five minutes maybe.

5        Q.   As it relates to the academy, not what was

6    happening at the scene, was there anything else that

7    was happening on that particular conversation on

8    October 30th?

9        A.   No.

10       Q.   Do you still want to be the Assistant Director

11   of the academy today?

12       A.   Absolutely.

13       Q.   Could you explain to the jury why that is?

14            MS. TUCKER:  Your Honor, I object.  That is

15   asked and answered with regard to why he wants to be

16   Assistant Academy Director.

17            THE COURT:  Overruled.

18            THE WITNESS:  It is my dream job on the police

19   department.  I have been involved in training.  I

20   started getting involved in training shortly -- little

21   over two years after I had graduated the police

22   academy, previous commanders had recommended me to get

23   involved in the training, which I graciously accepted.

24   It is my passion.

25            I believe this police department to be one of

1    the best in the nation, and I would really like to

2    continue with that, and make it even better than it is

3    now.

4              I believe I have everything that is necessary

5    to make police officers the best that they can be, to

6    help them along their way, and to have the ability to

7    maybe not have people that are as good as they could

8    be, that aren't cut out for police work, because in

9    every facet of this job, in any job, there are people

10   that shouldn't do the job sometimes.  In training is

11   where you discover who has what it takes and who

12   doesn't.

13             And I can only go forward in my career.  It

14   would be a good step to enhance my career, if I was

15   given the opportunity.  It is basics of police work

16   starting in training.  That's where you have to insure

17   that everything -- at least in my opinion -- that

18   everything is trained properly, and it brings out the

19   best in everybody that can do the job, to the best

20   help, everybody they come in contact with.

21        **Q.**   And anything else you want to add before I

22   move on in terms of why you still want to be Assistant

23   Director today?

24        **A.**   No, ma'am.

25        **Q.**   Could you explain to the jury how being denied

1    the Assistant Director position has impacted you

2    personally as it relates to your job?

3        **A.**   Being denied the position in and of itself

4    hasn't impacted me.  I was denied for positions before.

5    It was the reason I was denied, that's because of my

6    race.

7        **Q.**   Let me rephrase the question.  How has being

8    denied the Assistant Director position because of your

9    race impacted you personally in terms of your

10   performance of the job?

11       **A.**   It is -- especially at first, it has been

12   devastating.  You know, I go to work knowing that no

13   matter what I do or how good I have done something, or

14   what I have to do, no matter how well it is done, or

15   how well it is executed, it is not going to matter.

16           I used to think that the police department

17   would take care of you, would really acknowledge and

18   grasp the job that you did well-done, and sometimes

19   when people stand out, you want those people to move

20   forward in their career and be the next leaders of the

21   department.  I really thought that's what I was doing,

22   and where my career was going.

23           And when I was told I couldn't have this job

24   that I was more than qualified for simply because of

25   the color of my skin, it just made my lose faith in the

1   way things are done from the top level of this police

2   department, and it is sickening.  It is illegal and

3   sickening.  It really made me second guess my job, and

4   how to do it.

5          But I can't let that -- I couldn't let that

6   dictate how I deal with people on the street.  The

7   officers that depend on me.  The citizens that depend

8   on me to do my job.  It is very difficult.

9      **Q.**  Is there anything you wanted to explain to the

10  jury about how this decision has impacted you

11  professionally before I move on?

12         MS. TUCKER:  I object.  She asked, and he

13  answered the question.

14         THE COURT:  Overruled.

15         THE WITNESS:  Well, professionally, I mean, I

16  sued the police department.  My career is going

17  nowhere.  No matter -- no matter what happens in my

18  career now, I'm always going to have this label that I

19  sued the police department for this reason.

20         I mean, if that position came up today, and I

21  applied for it, I know darn good and well that I

22  wouldn't be selected for that position.

23         MS. TUCKER:  Your Honor, I'm going to ask you

24  to request -- or request that this last testimony be

25  stricken from the record, because this is sheer

1    speculation on Sergeant Bonenberger's behalf.

2         THE COURT:   It is.   I think that's what it was

3    called for.   I'm not going to strike it.   Members of

4    the jury, do you understand this is his opinion about

5    what he thinks.   It is not anything attributable to the

6    defendants.   Go ahead.

7         MS. PETRUSKA:   Thank you, your Honor.

8    **Q.**   (By Ms. Petruska)  Before I move on how it has

9    impacted you personally, anything else that you want to

10   explain to the jury about how it has impacted you

11   professionally; if not, I'll move on?

12   **A.**   Go ahead and move on.

13   **Q.**   Okay.   So could you explain to the jury,

14   please, how being denied this decision because of your

15   -- I'm sorry, denied the position of Assistant Director

16   because of your race has impacted your personal life?

17   **A.**   Yeah, I mean at first, I lost weight.   I had

18   trouble sleeping.   I mean, stress on my personal life,

19   my relationship with my wife and my children.   I know

20   it caused me to be shorter, I guess, that's the term,

21   quicker to react to things.

22         I could see that my -- I would get angry at

23   things I wouldn't normally get angry at home.   I just

24   have a harder time dealing with realities, the

25   obstacles that life offers you, because I knew no

1    matter what happened at work, I have to go out and do

2    the job.  That's the only thing required of me.  I have

3    to do it to the best of my ability.  I can't let that

4    go.

5           But I knew no matter what I did, it didn't

6    matter.  I can change all kinds of things at work or

7    try to make them change for the better.  The only thing

8    I cannot change is the color of my skin.  When you know

9    that's the reason why you didn't get the chance to

10   excel on something you love, it made it very difficult

11   to speak with people at home, and it has been

12   deflating.

13      **Q.**   Anything else again in terms of your personal

14   life, how this decision has impacted you that you want

15   to explain to the jury?

16      **A.**   Don't get me wrong, having to do this has been

17   agonizing just to go through it and get it to this

18   level, because I knew that it was just -- it took the

19   highest level that can evolve.  That's never going to

20   be good for you personally in your career, if you have

21   to go this way.

22           What happened to me was wrong.  It was

23   illegal.  It cannot be allowed to occur, and it must be

24   stopped.  I don't want anybody else to have to go

25   through this.  It has been just horrible, devastating.

63

1    I know I'm not going to get anywhere else in this

2    career.  Thank God, I'm close to 20 years.  I don't

3    have anything else to say.

4             MS. PETRUSKA:  Judge, if I may confer for one

5    moment, please.

6             THE COURT:  You may.

7             MS. PETRUSKA:  Thank you.

8        **Q.**  (By Ms. Petruska)  Sergeant Bonenberger, I

9    know you have referenced this briefly that it had an

10   impact on your family.  Could you go into a little bit

11   more detail about how the department's decision has

12   impacted -- I think you said your wife and children,

13   how has it impacted your relationship with your wife

14   and children?

15       **A.**  Well, since this has occurred, it becomes a

16   part of every conversation.  I don't know why.  It just

17   does.  It has caused me to be, I guess, a little bit

18   more distant at times when I start thinking about it,

19   and my son, one of my sons is 20.  My other son is five

20   now, interacting with them at times it becomes more

21   difficult when this is on my mind.  I have to separate

22   from them, and it is very very difficult.

23            My wife and I seem to argue quite a bit more.

24   I think that's -- I mean, I used to think that I was

25   the kind of guy that would -- things would roll off of,

1    if you know what I mean, where adverse things just roll

2    off you.

3              This isn't something that you can just accept

4    and move on.  It has just caused more difficulty with

5    dealing with my family.

6         Q.   Is your wife also a police officer?

7         A.   Yes, she is.

8         Q.   What department is she with?

9         A.   She works for the St. Louis Police Department.

10        Q.   And has the fact that you are both on the same

11   department have any impact on how this has impacted

12   your family?

13        A.   Absolutely, you know, I wasn't so much

14   concerned about what would happen to me, because I knew

15   it was me at the forefront, and I expected retaliation.

16   I expected to be black-balled.

17             It is not fair to my wife.  She is a police

18   officer.  She is darn good at her job.  She works very

19   hard at it and takes a lot of pride at what she does.

20             MS. TUCKER:  I would like to object to this.

21             THE COURT:  Can you approach the bench.

22             (Proceedings were held at sidebar, outside the

23   hearing of the jury.)

24             MS. TUCKER:  Your Honor, he is now getting

25   into the issue of how his wife feels, all that is

1    speculation.  He doesn't know for -- he doesn't know

2    that for a fact.  I think I have tried to be to just

3    not object, but now it seems like it is going on and

4    on.

5             THE COURT:  It sounded like to me we were

6    headed in a loss of consortium.

7             MS. TUCKER:  Or rehabilitation.

8             THE COURT:  Only one can talk at once.  What's

9    he going to say next.

10            MS. PETRUSKA:  That's not what I was trying to

11   get into.

12            THE COURT:  What is he going to say next?

13            MS. PETRUSKA:  I thought he was going to say

14   it caused additional stress for the family, because

15   they were with the same department.

16            THE COURT:  You will agree you will stop

17   asking these questions, move onto something else.  The

18   objection is sustained.

19            (Proceedings resumed in open court.)

20       **Q.**  (By Ms. Petruska) Sergeant Bonenberger, I'm

21   not asking you to speculate on how this has impacted

22   your wife's career.  What I'm asking you is has the

23   fact that your wife works for the -- can you describe

24   for the jury what the stress looks like, or what the

25   stress is like, because you guys both work for the same

1    department?

2            MS.  TUCKER:   Once again, I'm going to object

3    to relevancy.

4            THE COURT:   Sustained.

5            MS.  PETRUSKA:   Then I have no further

6    questions.

7            THE COURT:   You may cross-examine.

8            MS.  TUCKER:   Before we do that, could we

9    approach.

10           THE COURT:   You may.

11           (Proceedings were held at sidebar, outside the

12   hearing of the jury.)

13           MS.  TUCKER:   Your Honor, do you recall our

14   pretrial conference in one of the motions in limine,

15   plaintiff's motion in limine was that the evidence

16   regarding Mr. Bonenberger and why he didn't refile his

17   grievance when it wasn't appropriately filed.

18           She asked that be kept out of the motion in

19   limine, and you granted that if it became an issue for

20   me, to approach the bench.  In this particular

21   situation, I think the issue has come in that counsel

22   asked Sergeant Bonenberger why he did what he did.  He

23   basically said -- he wanted to minimize.  He wanted to

24   give the department an opportunity to right the wrong,

25   but he didn't do that, because they asked him to refile

1    the grievance appropriate.  He didn't do that.  He went

2    straight to the EEOC.

3            Now I think it is an issue, because it is like

4    the department totally ignored what his issue was when

5    race wasn't even part of the equation initially.

6            THE COURT:  What's your evidence about the

7    grievance.  What would you be presenting if I allowed

8    you to go into this.

9            MS. TUCKER:  When he filed a grievance, he was

10   instructed that the type he needed to grieve the

11   application process, not the fact that the Chief made

12   the transfer, because the chief can make the transfer

13   based on policies and procedure.  His issue was with

14   the process.

15           The fact I didn't receive an interview, which

16   is what his grievance specifically said.  They told him

17   to refile it and do it right.

18           THE COURT:  I don't understand what was wrong

19   with it.  You said -- what did he file.  What did they

20   tell him to do.  What was wrong with what he did?

21           MS. TUCKER:  Well, he didn't file -- he didn't

22   file an appropriate grievance.

23           THE COURT:  I was trying to understand what

24   was inappropriate.  You said he had to grieve the

25   application and this grievance.  I'm trying to -- why

1    did they tell him to go back and file an appropriate

2    grievance because --

3              MS. TUCKER:   Because your issue isn't with the

4    Chief of Police.   Your issue is the fact you didn't

5    have an interview.

6              THE COURT:   Who he named as the respondent

7    person, are you still objecting to that?

8              MS. PETRUSKA:   I would, your Honor, the reason

9    would be for the same reasons I said in the limine

10   motion.   I disagree with that.   You are going to have

11   this collateral dispute about whether he was told or

12   wasn't told.

13             He didn't file the grievance right.   He is

14   going to confuse the issue in the case.   It is going to

15   take a lot of time, when it is not a central issue in

16   the case.   They have evidence they are going to say

17   they said that he is going to say he granted to grieve

18   it; and you know, he was told he couldn't go to the

19   next step.   It is a collateral issue.

20             THE COURT:   I'm going to sustain the

21   objection, and instruct you, as I did in the motion in

22   limine, I don't believe this has opened the door.

23   Let's not get into the how the grievance was filed in

24   this whole issue.

25             (Proceedings resumed in open court.)

## CROSS-EXAMINATION

BY MS. TUCKER:

    **Q.** Good afternoon, Sergeant Bonenberger?

    **A.** Good afternoon.

    **Q.** I think you testified earlier that you had been on the police department. You have been with the St. Louis Metropolitan Police Department for 19 plus, almost 20 years; is that correct?

    **A.** Yes, ma'am.

    **Q.** And also just so I can make sure I'm understanding what you are saying, it is your testimony that Lieutenant Muxo told you that Lieutenant Colonel -- Lieutenant Colonel Harris told you that they wanted an African-American for the position for Assistant Academy position; is that correct?

    **A.** You--

    THE COURT: Could you rephrase the question or restate it. I'm not sure I caught it all.

    **Q.** (By Ms. Tucker) Is it your testimony that Lieutenant Muxo told you that Lieutenant Colonel Harris said that they wanted an African-American for the position for Assistant Academy director?

    **A.** Lieutenant Muxo told me that the position was going to a black female, and he had no control over it. It was Lieutenant Colonel Harris' decision.

1     **Q.**   Did he tell you where Lieutenant Harris got
2   that information from?
3     **A.**   No, ma'am.
4     **Q.**   So what is your position with regard to where
5   Lieutenant Colonel Harris got that information from?
6     **A.**   I have no idea.
7     **Q.**   Now, you have been a Sergeant for 19 plus
8   years, and as a sergeant --
9           THE COURT:   Counsel, I don't think he
10  testified to -- I think he said he had been with the
11  department for 19 plus years.
12          MS. TUCKER:   You are right.
13    **Q.**   (By Ms. Tucker)   You have been with the
14  department for 19 plus years.   You have been a Sergeant
15  for how long?
16    **A.**   Since March 18, 2009.
17    **Q.**   Since 2009, but at the time of the situation,
18  you had been a Sergeant for approximately a year?
19    **A.**   It was about a year and a half.
20    **Q.**   Okay so a year and a half, and during that
21  year and a half, I think you testified that as a
22  Sergeant, you had supervisory responsibilities,
23  correct?
24    **A.**   Correct.
25    **Q.**   To the people that you supervised?

1       **A.**   Yes, in the district.

2       **Q.**   You had to make sure that they comply with

3   policies and procedures, and special orders, and things

4   of that nature?

5       **A.**   Yes, ma'am.

6       **Q.**   And as a police officer for 20 years, as a

7   Sergeant for a year and a half at that time, you knew

8   that it was wrong to give one person a job over another

9   simply because of the color of their skin.  You knew

10  that was wrong, correct?

11      **A.**   Yes, I knew it was illegal.

12      **Q.**   And who did you report that to when that

13  happened?

14      **A.**   I reported it to the Human Resources Division

15  and the EEOC.

16      **Q.**   That was after the fact.  So when Muxo made

17  that comment to you, who did you report that to, prior

18  to applying for the job?

19      **A.**   I didn't report it to anybody prior to

20  applying for the job.

21      **Q.**   When you applied -- let's move onto the

22  application process.  When you applied for the

23  position, you knew that the position required three

24  years supervisory experience, correct?

25      **A.**   Yes, ma'am.

1      **Q.**   And you knew that you did not have three years

2    of supervisory experience, correct, as a Sergeant?

3      **A.**   I believed that I had met that threshold as an

4    acting Sergeant, not officially as the rank of

5    Sergeant, but combined, I believed I did.

6      **Q.**   The minimum requirements for the job, Sergeant

7    Muxo, were for three years as a Sergeant, not acting as

8    a Sergeant; is that correct?

9      **A.**   You addressed me Sergeant Muxo.

10     **Q.**   I'm sorry, Sergeant Bonenberger?

11     **A.**   It said the minimum qualifications were three

12   years supervisory experience, I believe.

13     **Q.**   And you did not have three years as an acting

14   Sergeant, as a Sergeant, as the rank of Sergeant; is

15   that correct?

16     **A.**   That's correct.

17     **Q.**   You also testified earlier that you felt you

18   were qualified for this position, because you had an

19   instructor's license; is that correct?

20     **A.**   That's one of the reasons.

21     **Q.**   Right, just one of the reasons, but in having

22   an instructor's license was not a minimum qualification

23   for this job; is that correct?

24     **A.**   I don't believe it was.

25     **Q.**   Let me show you again what has been marked as

1    Plaintiff's Exhibit 1, minimal requirements in

2    training; do you see where I'm talking about, Sergeant?

3        **A.**   Yes, ma'am, I do.

4        **Q.**   That doesn't say anything about having to have

5    an instructor's license, does it, under the minimum

6    requirements in training?

7        **A.**   No, it doesn't.

8        **Q.**   It doesn't say anything about being a field

9    training officer, does it?

10       **A.**   No, it does not.

11       **Q.**   Once again, that was one of the qualifications

12   that you had, that in your mind, made you more

13   qualified for this position than Sergeant Taylor,

14   correct?

15       **A.**   Absolutely.

16       **Q.**   It doesn't say anything about being a fire

17   arms instructor, does it, Sergeant?

18       **A.**   No.

19       **Q.**   Once again, that's a qualification that you

20   had in your mind that you thought made you more

21   qualified than Sergeant Taylor; is that correct?

22       **A.**   Yeah, when you consider somebody for the

23   position, obviously, you would want people that have

24   the most appropriate qualifications for a position.

25       **Q.**   I understand that, Sergeant, but I just need

1    you to answer yes or no, being a firearms instructor

2    was not a minimum qualification for this particular

3    position, am I correct?

4        **A.**   Yes, you are correct.

5        **Q.**   Also Sergeant, you testified earlier that in

6    your mind, this would have been a promotion for you; is

7    that correct?

8        **A.**   Yes.

9        **Q.**   Okay.  But the Assistant Academy Director

10   position, that did not come with a pay increase; is

11   that correct?

12       **A.**   That is correct.

13       **Q.**   It didn't come with any additional benefits;

14   is that correct?

15       **A.**   Well, that's debatable.

16       **Q.**   What additional benefits did it come with?

17       **A.**   When I was at the academy as an instructor,

18   the Assistant Director had a take home car and--

19       **Q.**   Okay, so with this particular position on the

20   time that you applied for it, do you know -- were you

21   going to get a take home car, do you know?

22       **A.**   I believe so, but I'm not sure.

23       **Q.**   You don't know that for sure?

24       **A.**   Right.

25       **Q.**   You are speculating about that?

1      **A.**   That's the way the past practice was, so I

2   just assumed that it was part of it.   There is also the

3   benefit of having holidays and weekends off, because it

4   is predominately a Monday through Friday daytime hour

5   job that's beneficial.

6      **Q.**   Okay, but you could also get the same

7   weekends, holidays off, if you have other positions --

8   if you are in other positions too.   That wasn't

9   something that was specifically related to this

10   position; is that correct?

11      **A.**   I really don't know of any other jobs on the

12   police department besides instructors that have Monday

13   through Friday, weekends off jobs other than aides to

14   commanders.

15      **Q.**   That's why you think this job was a promotion?

16      **A.**   No.   I think it was a promotion based on what

17   I testified to earlier with all of the added

18   responsibilities on your direct line of operating the

19   academy.

20      **Q.**   Let's just clean this up.   You weren't going

21   -- this Assistant Academy Director position did not

22   come with a pay increase; is that correct?

23      **A.**   That's correct.

24      **Q.**   Thank you.

25      **A.**   You are welcome.

1     **Q.**  And the department does not necessarily

2     consider this a promotion.  In the books, you are not

3     considered promoted; is that correct?

4     **A.**  No.  It is not another rank.

5     **Q.**  In going back to the qualifications of the

6     minimum requirements for training, you testified

7     earlier with regard to all of the teaching -- I'm

8     sorry, you testified earlier with regard to the fact

9     that you had written areas, I guess brochures, things

10    like that, for the police academy, that was not a

11    requirement for this position, authoring any type of

12    training materials was not a minimum requirement for

13    this position, was it?

14    **A.**  Part of the knowledge of police officer's

15    standards and testing, continuing education training

16    requirements would be.

17    **Q.**  To you, that means writing -- that's writing

18    manuals.  This does not say that part of the

19    requirements is that you author any manual for the

20    academy; is that correct, Sergeant?

21    **A.**  That's correct, but part of knowledge of the

22    police officer's standards and testing is included in

23    that knowledge would be knowing what is to be contained

24    in post-approval lesson plans and instructions from the

25    police academies in the State of Missouri.

1      **Q.**   This particular position in the minimum

2    requirements in training doesn't require you to have

3    any type of specific awards and commendations.  It

4    doesn't list that here, does it, Sergeant?

5      **A.**   Awards and commendations, no, ma'am.

6      **Q.**   Okay.  Now you testified earlier also that

7    when this position became available, you actually

8    called Lieutenant Muxo to inquire about the position,

9    correct?

10     **A.**   Yes, I did.

11     **Q.**   And Lieutenant Muxo told you that they already

12   had somebody in mind for the position?

13     **A.**   Yes.

14     **Q.**   Okay.  So that in and of itself, that's not

15   something that was unusual, is it, that a Commander

16   would have somebody in mind possibly for a position

17   that they may want them to fill?

18          MS. PETRUSKA:  I object, to the extent it

19   calls for speculation from the witness, if he knows.

20          THE COURT:  Do you know?

21          THE WITNESS:  I have no knowledge on who would

22   -- I have never been a Commander, so I have never made

23   that decision.

24          THE COURT:  So sustained.

25     **Q.**   (By Ms. Tucker)  Has any commander ever

78

1    approached you and asked you if you were interested in

2    a particular position?

3        **A.**  Once for a detachment, I believe.

4        **Q.**  Okay.

5        **A.**  Then of course, if you consider field training

6    officer a position, my Commander at the time, wanted me

7    to be a field training officer in '97.  That's not a

8    difference.  It is additional responsibilities.  I

9    don't know if that qualifies with your question.

10       **Q.**  Let's move to your grievance, Sergeant.  As

11   Plaintiff's Exhibit 13, in your grievance, it states:

12   "I was not granted an interview for the position of

13   Sergeant Assistant Academy Director after properly

14   submitting the application as outlined in special

15   order;" is that correct?

16       **A.**  That is correct.

17       **Q.**  Tell me where in this, my grievance is, tell

18   me where in that section you make reference of being

19   discriminated against in that section?

20       **A.**  In that section there doesn't appear to be any

21   reference.

22       **Q.**  Tell me in that section where you made

23   reference to the fact that Lieutenant Muxo told you

24   that position was already going to an African-American

25   female.  Where does it say that in that -- specifically

1    say that in that section?

2        **A.**   I didn't say that in that section.

3        **Q.**   Although you do reference the EEOC in the

4    section under a fair solution to my grievance.   Once

5    again, you make no reference to being discriminated

6    against or being told that the position was going to an

7    African-American; is that correct?   I understand the

8    EEOC language.

9            What I'm asking you specifically do you state

10   anything in there about being told this position was

11   going to an African-American or race discrimination?

12       **A.**   No, it is not specifically included in there.

13       **Q.**   You could have written that in where it says

14   my grievance is.   You could have written that there,

15   correct.   There is no reason you could not have written

16   that there?

17       **A.**   Well, I could have written anything in there.

18       **Q.**   You could have written anything there that you

19   wanted to, correct?

20       **A.**   Yes.

21       **Q.**   Same with regard to a fair solution to my

22   grievance.   Once again, that is strictly up to you.

23   You can write anything in there you want to write in

24   there, correct?

25       **A.**   Yes.

1    **Q.**   You also testified earlier that after filing

2    this grievance -- strike that -- if I recall your

3    testimony correctly, you indicated that you did not

4    want to throw Lieutenant Muxo under the bus; is that

5    correct?

6        **A.**   Yeah, I don't know if that's the proper words,

7    but that's the best I could come up with.

8        **Q.**   That would have been with regard to naming him

9    in the -- or making allegations of discrimination that

10   he told you in your grievance; is that correct?

11       **A.**   Are you asking if that's the reason why I

12   didn't name him directly in the grievance?

13       **Q.**   According to you, you said you didn't want to

14   throw him under the bus.  That's why you didn't name

15   him?

16       **A.**   That's correct.

17       **Q.**   And you wanted to minimize the issue?

18       **A.**   No, I wanted to minimize any potential for

19   damages, collateral damage, that Lieutenant Muxo might

20   receive.

21       **Q.**   So then that's when you filed the EEOC charge,

22   after filing the grievance where you wanted to minimize

23   anything, any issue; is that correct?

24       **A.**   It was after I filed the grievance, yes,

25   ma'am.

81

1    **Q.**   You also testified earlier that you filed the

2    grievance like this, because you wanted to give the

3    department an opportunity to address the issue; is that

4    correct?

5    **A.**   Yes, I wanted to give them an opportunity to

6    address what had been done.

7    **Q.**   How could they address the issue, if you don't

8    tell them what the issue is?

9    **A.**   I think with mentioning that I wanted an

10   interview with the member of the EEOC present, they

11   would be able do see what the issue was.

12   **Q.**   You expected that they would speculate and

13   figure that out?

14   **A.**   In a way, yes, I did.

15   **Q.**   Sergeant, you take issue with the fact that

16   Sergeant Taylor was transferred into this position, as

17   opposed to you, and she did not meet the minimum

18   qualifications, is that correct?

19   **A.**   No, I don't take issue with that at all.

20   **Q.**   But it is your testimony that she did not meet

21   the minimum qualifications; is that correct?

22   **A.**   Yes, that's correct.

23   **Q.**   Nor did you?

24   **A.**   Yes, that's correct.

25   **Q.**   Sergeant, are you currently the President of

1    the Police Officers Association?

2        **A.**   Yes, I am.

3        **Q.**   And you became President after this incident

4    occurred?

5        **A.**   Yes.

6        **Q.**   And in that position, you have routine

7    meetings with the Chief of Police; is that correct?

8        **A.**   I wouldn't say routine meetings.   That's too

9    subjective to identify.

10       **Q.**   How often do you meet with the Chief of

11   Police?

12       **A.**   When Chief Isom was the Chief, I would say I

13   met with him every other week, once a month, or

14   whenever meetings were called by the Chief or by the

15   Union to address issues between management and labor.

16            Since Chief Dotson has been in office,

17   initially I would meet with or speak with him probably

18   on a weekly basis, but over the last few months,

19   probably once a month, that's probably the best

20   timeframe I can give you as far as meeting with the

21   Chief goes.

22       **Q.**   You have a good working relationship with

23   Chief Dotson?

24       **A.**   I would say that it is a good relationship.   I

25   had a real good working relationship with Chief Isom

1    as well, at least in my opinion.

2        Q.   As President of the Police Officers

3    Association, you also have interaction with the Board

4    of Police Commissioners?

5        A.   I have had to have, I believe, at least three

6    meetings with Richard Gray, who is the President of the

7    Board of Police Commissioners, and it was over issues

8    -- issues with the police department.

9        Q.   As the President of the Police Officers

10   Association, what are your responsibilities?

11       A.   Well, I'm the CEO of the Police Association.

12   I'm responsible for the budget with the association.

13   It is well over a million dollars.  Responsible for all

14   of the administrative aspects associated with an

15   organized labor union, including being basically

16   responsible for all of the employees, as well as over

17   1,000 members of the police department that are members

18   of the union, having to deal with any issues that may

19   come to light surrounding labor and management.

20       Q.   You have done this successfully?

21       A.   I believe I have been very successful.

22       Q.   Being the President of the Police Officers

23   Association, I would -- would you describe that as an

24   important role?

25       A.   Well, I would say it is important to those who

1    elected me in the position, but it is not very

2    important to the management of the police department.

3        Q.   But you have people that rely on you as

4    President of the Police Officers Association; is that

5    correct?

6        A.   I would say that's a fair statement, yes,

7    ma'am.  I would like to go back and re answer the

8    question.  I wasn't clear on your question about when I

9    became President of the Association.

10       Q.   Uh-huh?

11       A.   I believe I answered that yes, that I became a

12   president after this incident.  But I'd like you to

13   know that this happened in the beginning was

14   September 2010, and I ran for President of the

15   Association in the summer months, early fall of 2011.

16   Then I took office when I was elected on November 1st.

17       Q.   Okay?

18       A.   I don't know if that helps clarify.

19       Q.   You ran for the position, and you took office

20   after this incident?

21       A.   Yes, ma'am.

22       Q.   And that's not a position -- this is a

23   position that I would imagine you take very seriously?

24       A.   Yes, ma'am.

25       Q.   You would not have run for this position had

1    you not thought you were qualified for this position;

2    is that correct?

3         **A.**    The position of the President?

4         **Q.**    Yes, sir.

5         **A.**    Yeah, I run for that.  I don't know if there

6    is a qualification.

7         **Q.**    Sergeant Bonenberger, is it your testimony --

8    I just want to confirm your testimony, is the fact that

9    there were, in fact, three applicants for the position;

10   is that correct, as far as you know?

11        **A.**    For what?

12        **Q.**    For the Assistant Academy Director position?

13        **A.**    As far as I know, yes.

14        **Q.**    As far as you know, I know you know that you

15   did not, from the three years as a Sergeant, and

16   Sergeant Taylor didn't have the three years as a

17   Sergeant, what about the third applicant?

18        **A.**    Sergeant Buckeridge.

19        **Q.**    Right?

20        **A.**    Was promoted after myself and Sergeant Taylor,

21   so he didn't possess the three-year requirement either.

22        **Q.**    I am also showing you, Sergeant, what has been

23   marked as Plaintiff's Exhibit 8.  That's your

24   performance appraisal?

25        **A.**    Yes, ma'am.

1    **Q.**   Was this a part of the application that you

2   had to turn in when you applied for the Assistant

3   Academy Director position?

4    **A.**   I don't know if I turned them in with the

5   application or not.

6    **Q.**   You don't know whether this was actually

7   attached to your application when you turned it in for

8   the position; is that correct?

9    **A.**   I don't remember.  I don't know, but I can

10   only assume that those would be making the decision

11   would look into your past performance.  I don't know.

12   I might have turned it in with it.  I don't remember.

13    **Q.**   Right, but I understand what your assumptions

14   are, but you don't know that for a fact either,

15   correct?

16    **A.**   Which part?

17    **Q.**   That this was reviewed when the commission

18   interview sheet -- the application was submitted?

19    **A.**   No, I don't know.

20    **Q.**   Sergeant Bonenberger, I think we have made it

21   clear that none of the three applicants had the three

22   years of Sergeant experience when you all applied for

23   the Assistant Academy Director position -- strike that.

24   Back to Plaintiff's Exhibit 3, Sergeant, that is your

25   commissioned interview sheet?

1      **A.**   Yes.

2      **Q.**   If you turn to page -- the third page of that

3  commission interview sheet, all the way down from the

4  bottom.   Actually, if you would start on the next page,

5  I think.

6            Yes, Sergeant, I'm sorry, if you would start

7  on the next page on the bottom number 3089, do you see

8  where I'm talking about.   We are going to start at the

9  first column?

10     **A.**   Yes, ma'am.

11     **Q.**   Okay.   We are going to talk about your history

12 with the police department.   That hasn't been addressed

13 yet in your direct testimony.

14           Sergeant, since you have been with the St.

15 Louis Metropolitan Police Department, have you been

16 reprimanded at all?

17     **A.**   Yes.

18     **Q.**   And it is -- I'm going to go through those now

19 with you.   I just want to make -- I want you to tell me

20 whether you agree with me or not?

21     **A.**   Okay.

22     **Q.**   In 1994, you received a written reprimand?

23           THE COURT:   Excuse me, does this have anything

24 to do with the exhibit you are showing the jury.

25           MS. TUCKER:   Yes, your Honor, it is all listed

88

 1    there in the section.

 2        Q.   (By Ms. Tucker)   In 1994, you had a written

 3    reprimand for a chargeable car accident?

 4            THE COURT:   Where is it on the document.   I

 5    don't see anything here.

 6            MS. PETRUSKA:   Thank you, your Honor.

 7            THE COURT:   If you would point where you are

 8    talking about.

 9            MS. TUCKER:   Actually it goes into '95.

10            THE COURT:   Okay.   The document says return to

11    duty.   Is that what you are talking about, or I don't

12    know.   I can't -- I just, if it is what you are asking

13    him about, that's fine.   If you will just point it out.

14    It is hard when you have the document up and everybody

15    thinks we are supposed to look at the document.   You

16    are talking about something else.

17            If you want to just point it out and ask the

18    question.   That will be fine.   Go ahead.   You can put

19    it back on.   Make sure we know what you are talking

20    about.

21            THE COURT:   We are still on Exhibit 3, right.

22            MS. TUCKER:   Yes.   Actually, your Honor, I'm

23    going to take the exhibit down.   I'll show you

24    Defendant's Exhibit J.

25            THE COURT:   Hold on a second.   Is that one

1    already in evidence.  Yeah, it is, it is the agreed

2    one.  You can show J.

3            MS. TUCKER:  The first page of Exhibit A.

4            THE COURT:  J.

5            MS. TUCKER:  J, I'm sorry.

6        Q.  (By Ms. Tucker)  Sir, is that a chargeable

7    offense for a vehicle accident?

8        A.  Yes, I believe so.

9        Q.  That occurred back in April of '94?

10       A.  Yes.

11       Q.  You received a written reprimand for that?

12       A.  Yes.

13       Q.  Then the next page is -- once again, you

14   received disciplinary action for another vehicle

15   accident; is that correct, this was your second

16   chargeable accident?

17       A.  Yes.

18       Q.  What type of reprimand did you receive as a

19   result of that?

20       A.  That was a one day suspension.

21       Q.  Okay.  Then here, Sergeant, it looks like you

22   have another chargeable offense that you received a

23   written reprimand for.  That was another auto accident;

24   is that correct?

25       A.  Yes.

1    **Q.**   Then here, Sergeant, it looks like you were

2    suspended for six day disciplinary leave without pay,

3    what was that about, Sergeant?

4    **A.**   That was involving an off-duty incident with

5    an off-duty officer.

6    **Q.**   It was off-duty, but you were suspended for it

7    -- from work though?

8    **A.**   Yes.

9    **Q.**   For six days without pay?

10   **A.**   Yes, ma'am.

11   **Q.**   You have another violation here, where it

12   looks like you may have received one day suspension?

13   **A.**   Yeah, that was one that I --

14   **Q.**   You failed to appear in court?

15   **A.**   I forgot about court, yes, ma'am.

16   **Q.**   Then you have another violation of Rule 9

17   here, and this was a two-day suspension?

18   **A.**   That one I never accepted the punishment on.

19   I was suspended for it anyway.  I never accepted the

20   punishment on.

21   **Q.**   This was discharging a firearm from a moving

22   vehicle?

23   **A.**   That guy tried to kill me, and I shot at him.

24   It violated policy.

25   **Q.**   You were charged for it?

1      **A.**   I never accepted it.  I was suspended and lost

2    the two days pay as well.

3      **Q.**   Let me go over my notes real quickly,

4    Sergeant.  Sergeant, you testified that you wanted this

5    Assistant Academy Director position, because it would

6    allow for you to have exposure and possibly be promoted

7    to Lieutenant; is that correct?

8      **A.**   Well, no it would give me --

9           MS. PETRUSKA:  I object.  I do believe it

10   mischaracterizes previous testimony.

11          THE COURT:  Overruled.  He can explain what he

12   said.  You can answer.

13          THE WITNESS:  No, it has the potential to help

14   advance your career.

15     **Q.**   (By Ms. Tucker)  And advancement in your

16   career would be you going from Sergeant to Lieutenant;

17   is that correct?

18     **A.**   That would be one way.  Another way would be

19   going to another assignment that I consider to be a

20   promotion as well.

21     **Q.**   And in order to be promoted from Sergeant to

22   Lieutenant, it is not your testimony that all you have

23   to do is have the correct high-profile job.  That's not

24   your testimony, is it?

25     **A.**   That's the only reason to be promoted.  Is

1    that what you are asking?

2        Q.    That's the basis for -- the foundation of

3    being promoted is having a high-visibility job?

4        A.    I would certainly hope not.

5        Q.    There are other aspects that you have to

6    comply with in order to be promoted; is that correct?

7        A.    Yes.

8        Q.    And taking a test is one of those?

9        A.    Yes.   There is a written test, if that's what

10   you are asking.

11       Q.    When you take those tests, how is that test--

12   how are the results coming down as a result of the

13   test?

14            MS. PETRUSKA:   Judge, can I object at this

15   point and approach.

16            THE COURT:   You may approach the bench.

17            (Proceedings were held at sidebar, outside the

18   hearing of the jury and an off-the-record discussion

19   was had.)

20            THE COURT:   That's okay.   We will take a short

21   break, for the jury, a second recess, while we discuss

22   this.   So the jury is excused for ten minutes.

23            (At 4:00 p.m., the Proceedings stood in

24   temporary recess.)

25            THE COURT:   You can go to the lectern.   Hold

1   on a second.  I'm looking for my notes from the final

2   pretrial.

3            Yeah, so the plaintiff filed a motion in

4   limine, and I agreed that the results of the 2012

5   Lieutenant's test should not be received into evidence,

6   but the defendant could approach the bench, if he was

7   going to ask about those, if she was.

8            MS. TUCKER:  Right.  I was not going to ask

9   about the results of the 2012 Lieutenant's exam.  I was

10  trying to elicit testimony with regard to that.  There

11  is a procedure that you have to go through in order to

12  be promoted to Lieutenant.  It is not just being in a

13  high-profile or high-visibility position.

14           THE COURT:  Your question was:  "When you take

15  those tests, how are the results coming down as a

16  result of the test."  That's the question, and your

17  objection was to that question, I mean.

18           MS. PETRUSKA:  That's why I asked to approach,

19  because I thought -- I thought we were getting into the

20  motions in limine at this point.  We were getting into

21  the whole issue of Sergeant Bonenberger not really

22  being eligible for promotion, which I thought was a

23  limiting issue.  That's where I thought we were

24  heading.

25           MS. TUCKER:  No, that's not.

1          THE COURT:   Why are you asking this question.

2    Why does it matter how the results come down.

3          MS. TUCKER:   Because I wanted him to explain

4    that they have clusters A, B, and C.   That they are

5    promoted out of clusters.   I wasn't going to ask him

6    whether he had taken the exam, and what cluster he fell

7    in.

8          THE COURT:   Why are the clusters, and how they

9    were promoted out of the clusters, relevant to this

10   case?

11         MS. TUCKER:   Because I want the jury to

12   understand being in a high-profile position isn't the

13   only way you get promoted.

14         THE COURT:   He has already admitted that.

15   I'll sustain the objection.   We will be in recess for

16   six minutes.

17         (At 4:14 p.m., the Proceedings resumed in open

18   court.)

19         THE COURT:   You may continue with your

20   cross-examination.

21     **Q.**   (By Ms. Tucker)   Sergeant, I just have a few

22   more questions for you.   Prior to the Assistant Academy

23   Director position opening up, you were a Sergeant; is

24   that correct?

25     **A.**   Yes.

1      **Q.**   Okay.   And the position of the Assistant

2   Academy Director, that's also a Sergeant position; is

3   that correct?

4      **A.**   Yes.

5      **Q.**   Your relationship with Lieutenant Muxo, you

6   would describe it as a professional relationship; is

7   that correct?

8      **A.**   Yes, I would.

9      **Q.**   You guys didn't have a relationship outside of

10   work, like you hung out, or anything like that?

11      **A.**   That is correct.

12      **Q.**   Now, I'd like to talk about your damages that

13   you testified to that you sustained as a result of not

14   being transferred into the Assistant Academy Director

15   position.   You guys haven't taken any time off

16   specifically for any sick leave since 2010, since this

17   position became available, you have not taken off any

18   sick leave; is that correct?

19      **A.**   That is correct.

20      **Q.**   And you haven't sought any medical treatment,

21   whether it be psychologist, psychiatrist, any type of

22   therapy, or anything like that as a result of this

23   incident; is that correct?

24      **A.**   That's correct.

25      **Q.**   Once again, we established that you didn't

1    lose any pay; is that correct?

2        **A.**   That's correct.

3        **Q.**   You didn't receive any type of demotion, like

4    you are still a Sergeant; is that correct?

5        **A.**   Yes, that's correct.

6        **Q.**   Then you also stated that as far as your

7    personal life, you lost weight, you had trouble

8    sleeping.  Once again, you didn't seek any professional

9    help as a result of that?

10       **A.**   That's correct.

11       **Q.**   You didn't go to a doctor, or psychologist, or

12   psychiatrist, or anything of that nature; is that

13   correct?

14       **A.**   That's correct.

15          MS. TUCKER:  I don't have anything further.

16   Thank you, Sergeant.

17          THE COURT:  Redirect?

18          MS. PETRUSKA:  Thank you, your Honor.

19                 <u>**REDIRECT EXAMINATION**</u>

20   BY MS. PETRUSKA:

21       **Q.**   Sergeant Bonenberger, first I want to ask you

22   about the discipline you described, Exhibit J.  All of

23   that happened before you were assigned to the academy

24   as an instructor; is that correct?

25       **A.**   Yes.

1    **Q.**   And in terms of some of the driving issues,

2    you were reprimanded for accidents, that all happened,

3    and the department has kept you as a driving training

4    instructor; is that correct?

5    **A.**   Yes, ma'am.

6    **Q.**   You were asked some questions about the

7    minimal requirements for the Assistant Director

8    Position as set forth in Exhibit 1; do you recall that?

9    **A.**   Yes, I do.

10    **Q.**   Let me ask you this, one of the other minimal

11    requirements is two years experience as an academy

12    instructor, or two years prior classroom teaching

13    experience; is that correct?

14    **A.**   Yes, ma'am.

15    **Q.**   Did you have that minimal qualification?

16    **A.**   Yes, ma'am.

17    **Q.**   To your knowledge, did Sergeant Taylor have

18    that minimal qualification?

19    **A.**   To my knowledge, no.

20    **Q.**   Then you see here at the bottom of the page,

21    it talks about desired qualifications and training.  I

22    have to flip the page again, so give me a second, and

23    one of the desired qualifications and training is the

24    Instructor Development School course; do you see that?

25    **A.**   I do.

1    **Q.**   Is that your post-certification?

2    **A.**   It is.  You have to successfully complete the

3    Instructor Development Course before you can become a

4    post-certified instructor in the State of Missouri.

5    That's how you get the certification.

6    **Q.**   That was at least -- it wasn't a mandatory

7    requirement, but it was a desired qualification for the

8    job?

9    **A.**   Yes, it was.

10   **Q.**   We have probably beat this dead horse, but I

11   wanted to be clear.  In terms of the grievance, in your

12   mind, did you believe you were trying to alert the

13   department to discrimination?

14   **A.**   In my mind, I was, because that's why I wanted

15   the member of the EEOC present during any subsequent

16   interviews to insure that discrimination didn't occur.

17   **Q.**   Now, you were also asked some questions about

18   being the President of the Police Officers Association;

19   do you recall those questions?

20   **A.**   Yes.

21   **Q.**   Being President of the Police Officers

22   Association, that is not selected by the command ring,

23   correct?

24   **A.**   No.

25   **Q.**   It was an elected position?

1      **A.**    Yes.

2      **Q.**    Who elects you?

3      **A.**    The members of the Police Association.

4      **Q.**    And what's the highest rank of a member of the

5      Police Association can be?

6      **A.**    Chief.

7      **Q.**    Member of the Police Association?

8      **A.**    Yes.

9      **Q.**    The Chief can be?

10     **A.**    Any member, any active commissioned police

11     officer can join the Police Officers Association

12     regardless of rank, but they do restrict that no rank

13     above Sergeant can run for and achieve an elected

14     position on the executive board.

15     **Q.**    Is the rank and file of the Association

16     primarily Officers and Sergeants, or are there Captains

17     and Lieutenants, Majors and Colonels in there?

18     **A.**    There are.  The breakdown pretty much follows

19     the line of the police department.  Obvious, there is

20     one Chief.  There is a handful of Colonels, handfuls of

21     Majors, 12 or so Captains, hundred or so Lieutenants,

22     200 or so Sergeants, the rest are patrol officers or

23     police officers in that rank.

24     **Q.**    Do the command rank officers vote for

25     President of the Association?

1    **A.**  Yes, they do.

2         THE COURT:  When you state all of those

3    numbers and stuff, are you saying all of those people

4    are members of the Police Officer's Association?

5         THE WITNESS:  No, I was giving the example

6    about a breakdown in the amount of people.

7         THE COURT:  I didn't understand.

8         MS. PETRUSKA:  Let me clarify, because I think

9    the Judge is asking an important distinction.  You gave

10   us the number of how many people are in those ranks.

11        THE COURT:  In the department.

12        THE WITNESS:  In the department, yes, ma'am,

13   roughly.

14   **Q.**  (By Ms. Petruska)  My question was -- thank

15   you, Judge -- my question was how many of the people

16   are actually members of the Association?

17   **A.**  I don't have the exact number, but we do have

18   numbers of all ranks.  I believe the current Chief is

19   also a member of the Association.

20   **Q.**  Okay.  Let me ask you this way then, do you

21   consider being President of the Police Officers

22   Association a career-enhancing position?

23   **A.**  No, no, probably the opposite.

24   **Q.**  Why not?

25   **A.**  Just by the nature of it.  It puts you at

1   odds, or an adversarial position, with the management

2   of the police department.

3       **Q.**   Anything else you want to add before I sit

4   down about why you would not consider the Presidency of

5   the Association to be a career-enhancing assignment?

6       **A.**   I can only speculate on opinions of

7   Commanders.  No, I don't have anything to add.

8           MS. PETRUSKA:  Then that's all of the

9   questions I have, your Honor.

10          THE COURT:  You may step down.  You may call

11  your next witness.

12          THE WITNESS:  Thank you.

13          MS. PETRUSKA:  Plaintiff will call Sergeant

14  Deborah Boelling.

15          THE COURT:  Ma'am, if you step up here to the

16  clerk to be sworn.

17                   <u>SGT. DEBORAH BOELLING</u>,

18  being produced and sworn, testified as follows:

19                   <u>DIRECT EXAMINATION</u>

20  BY MS. BARTH:

21      **Q.**   Good afternoon.  Can you please introduce

22  yourself to the jury?

23      **A.**   My name is Deborah Boelling.

24      **Q.**   You are currently a Sergeant with the St.

25  Louis Metropolitan Police Department?

1      A.   That's correct.

2      Q.   Are you on duty today?

3      A.   I'm not.  I'm off.

4      Q.   How many years have you been a police officer

5  with the St. Louis Metropolitan Police Department?

6      A.   19.

7      Q.   19 years?

8      A.   Correct.

9      Q.   And during your tenure as a police officer

10  with the department, have you been recognized with any

11  awards or special achievements?

12      A.   I have.

13           MS. TUCKER:   Objection, relevance.

14           THE COURT:   Overruled.

15      Q.   (By Ms. Petruska)  Your answer was yes?

16      A.   It was.  I have several awards.

17      Q.   What awards are those?

18      A.   I received three Chief letters of

19  commendation.  I received four or five awards of

20  excellence.  I have been awarded the officer of the

21  month.  I have been awarded a leadership award of

22  excellence.  I think that's about it.

23      Q.   And what are -- what's a letter of

24  commendation from the Chief?

25      A.   It is where the Chief recognizes you for doing

1    something exemplary while in the line of duty.

2        Q.   When were you promoted to the rank of

3    Sergeant?

4        A.   November of 2001.

5        Q.   Before you were promoted, Sergeant, did you

6    ever provide any training to new officers?

7        A.   I did.  I was a field training officer for a

8    number of years before I was promoted.

9        Q.   What is a field training officer?

10       A.   When a recruit graduates the academy, they go

11   into police work.  It is like on-the-job training.

12   They are paired up with an officer who trains them,

13   teaches them how to apply the book knowledge they

14   learned at the academy toward police work, helps them

15   through report writing, probable cause for car stops,

16   how to handle and talk to people on the scene, things

17   like that.

18       Q.   How long were you a field training officer?

19       A.   About four years.

20       Q.   What is the process that you follow to become

21   a field training officer?

22       A.   They post a position department-wide for field

23   training officers.  You have to complete a commissioned

24   interview sheet and essentially apply for it.  It has

25   to be approved through your chain of command.  Then it

1    is forwarded to the academy.  They have the ultimate

2    approval to accept you as a training officer.

3         Q.   So that is something that you sought out to

4    do, correct?

5         A.   Correct.

6         Q.   Then is that the only thing you did to train

7    new officers before you were Sergeant?

8         A.   Yes.

9         Q.   Then after you were promoted to Sergeant, did

10   you hold any positions that provided training to new

11   officers?

12        A.   I did.  I was assigned to the academy as the

13   Field Training Coordinator; and basically, I oversaw

14   everyone who was in the field training program at the

15   time, both the field training officers and the

16   probationary police officers.

17        Q.   Was that a permanent full-time position?

18        A.   Yes, ma'am.

19        Q.   Were you assigned permanently to the police

20   academy while you were the Field Training Coordinator?

21        A.   Yes, I was.

22        Q.   What was the process that you underwent to

23   become a Field Training Coordinator?

24        A.   Same thing.  It was an advertised position

25   department-wide.  I applied for the position, completed

1    a commissioned interview sheet, got approval from my

2    chain of command, and then forwarded it onto the

3    academy.   Then I had to go through an interview

4    process.

5          **Q.**   And how long did you serve as the Field

6    Training Coordinator at the police academy?

7          **A.**   That was a little bit over a year.

8          **Q.**   What was the year that you did that?

9          **A.**   2003.

10         **Q.**   After your Field Training Coordinator

11   position, was there any other position that you held

12   that provided training to new police officers?

13         **A.**   Before the Assistant Director position or?

14         **Q.**   Yes?

15         **A.**   No.

16         **Q.**   Then at some point, you were appointed to the

17   position of the Assistant Director to the police

18   academy?

19         **A.**   Correct.

20         **Q.**   What year was that?

21         **A.**   2009.

22         **Q.**   You were appointed to that position as a

23   Sergeant?

24         **A.**   Yes, ma'am.

25         **Q.**   Have you ever taken the Lieutenant's exam?

1      **A.**   Several times.

2      **Q.**   Have you ever taken the Lieutenant's exam

3   since you have been appointed to the Assistant Director

4   position?

5      **A.**   No.

6      **Q.**   When you were the Assistant Director of the

7   police academy, what were your duties?

8      **A.**   Well, I was involved with recruit planning.  I

9   had to repair their schedule for their 26 or 28 weeks

10  of training.  I had to manage six budgets that were

11  routed through the academy.  I sat in recruit classes

12  to evaluate instructors.

13         I did some training of the recruits.  I went

14  through the rules and regulations, introductions, I

15  covered the Field Training Program with them when they

16  were there, but that was more towards the end of their

17  training.  I did a number of things.

18     **Q.**   What is the importance of having experience in

19  training officers to the position of Assistant

20  Director?

21     **A.**   When recruits enter the academy, this is a

22  major stepping stone for them to mold them into young

23  police officers.  They are very impressionable.

24  Generally, they are very young.  It is a para military

25  structure, so we want to teach them about our rules and

1    regulations and rank, and how important that is, and

2    appearances mean a lot.  Your interaction with them

3    means a lot.  It is a basis for which they are going to

4    be successful in their career as an officer.

5        Q.   And would you say when you were the Assistant

6    Director of the academy, that you had shown a passion

7    for training prior to taking that position?

8        A.   Absolutely.

9        Q.   Would you say it is important to have a

10   passion for training new officers in the position of

11   Assistant Director?

12       A.   Without a doubt.

13       Q.   At the time of your appointment, who was your

14   immediate supervisor?

15       A.   Lieutenant Anthony McDuffy.

16       Q.   At some point, did Lieutenant Muxo become your

17   district supervisor?

18       A.   He did.

19       Q.   When did that occur?

20       A.   Early 2010, I believe, March, February maybe.

21       Q.   And at some point, you were transferred out of

22   the academy?

23       A.   Correct.

24       Q.   And do you recall that the open position for

25   Assistant Director was posted?

1      **A.**   It was.

2      **Q.**   Do you recall when that occurred?

3      **A.**   Just prior to my transfer.  I think it was

4   sometime in September of 2010.

5      **Q.**   And prior to that job being posted, did you

6   have any conversations with Lieutenant Muxo as to who

7   would replace you in the position of Assistant

8   Director?

9      **A.**   I did.  I had several informal conversations

10   with him.

11      **Q.**   What did he tell you?

12          MS. TUCKER:  Objection, hearsay.

13          THE COURT:  Overruled, for the reasons stated

14   in the pretrial rulings, go ahead.

15          THE WITNESS:  He told me that Harris wanted a

16   black female in the position, and that there no way

17   they were going to put a white male in that position.

18      **Q.**   (By Ms. Barth)  And he told you that even

19   before the position was posted?

20      **A.**   He did.

21      **Q.**   And did you have any conversations with

22   Lieutenant Muxo about who you thought would be the good

23   person for the position of Assistant Director?

24      **A.**   I did.  I recommended David Bonenberger.

25      **Q.**   Why did you make that recommendation?

1      **A.**   I worked with David in the Third District.   I

2    got to know his style of police work.   He is a very

3    good investigator, very good report writer, very

4    passionate about the job.   And then later in his

5    career, he taught at the academy.   He assisted with

6    driver's training, and I think patrol or criminal

7    investigation, but he had written several lesson plans.

8    Those lesson plans were so well-written that after he

9    had left the academy, we were still using them by the

10   instructors.

11          He did still come down to the academy, even

12   after transfer, to do some adjunct work, training, do

13   training for both recruits and department members who

14   had been involved in accidents.   He was still involved,

15   even though he wasn't personally assigned to the

16   academy.

17     **Q.**   So would you say that Sergeant Bonenberger had

18   shown a passion for training new police officers?

19     **A.**   Absolutely.

20     **Q.**   Then after the job was posted, did you have

21   any other conversations with Lieutenant Muxo about who

22   would be put in the position?

23     **A.**   I had asked him who he was interested in, he

24   had mentioned a specific person.

25     **Q.**   Who was that?

1    **A.**   Angela Taylor.

2    **Q.**   Did he tell you why they were looking to put

3    Angela Taylor into the position?

4    **A.**   Just again, he had said that Harris wanted a

5    black female in that position.

6    **Q.**   Did he say why they would not put David

7    Bonenberger into the position?

8    **A.**   No.

9    **Q.**   Did he respond to your suggestion that

10   Sergeant Bonenberger would be a good choice in any way?

11   **A.**   He was indifferent.  I wouldn't say he said

12   anything negative or positive per se, other than there

13   is no way they are going to let me put a white man in

14   there.

15        MS. BARTH:  I have no further questions of the

16   witness -- sorry.

17   **Q.**   (By Ms. Barth)  Sergeant, what was the race of

18   Lieutenant McDuffy?

19   **A.**   He was a black male.

20        THE COURT:  Cross-examination?

21                  <u>CROSS-EXAMINATION</u>

22   BY MS. TUCKER:

23   **Q.**   Good afternoon, Sergeant Boelling?

24   **A.**   Good afternoon.

25   **Q.**   When you were a field training officer, as a

1   field training officer, I think you testified that you

2   were basically provided on-the-job training, or helping

3   with the on-the-job training for the probationary

4   officers?

5       **A.**   Correct.

6       **Q.**   You basically guided them, told them, or

7   directed them with regard to -- for lack of a better

8   term -- good and bad policing; is that correct?

9       **A.**   That would be correct.

10      **Q.**   Now you and Lieutenant Muxo are not friends;

11  is that correct, you are not personal acquaintances.

12  You don't have relations outside of the workplace; is

13  that correct?

14      **A.**   Correct.

15      **Q.**   You have known Sergeant Bonenberger since the

16  time, were you in the academy together or --

17      **A.**   No, he was a class or two ahead of me.  So no,

18  we weren't in the academy together.  We worked together

19  in District 3.

20      **Q.**   You worked together with him for approximately

21  seven years?

22      **A.**   Roughly, yes.

23      **Q.**   When you allege these comments were made by

24  Lieutenant Muxo, was there anybody else present at that

25  time?

1      **A.**   There were several conversations of this

2  nature, and on a couple of those occasions, Sergeant

3  Tucker was present in my office.

4      **Q.**   All right.   When you were having these

5  conversations with Lieutenant Muxo, you knew that you

6  were going to be transferred out of the position,

7  correct?

8      **A.**   Correct.

9          MS. TUCKER:   I don't have anything else.

10  Thank you.

11          THE COURT:   Any redirect?

12          MS. BARTH:   No, your Honor.

13          THE COURT:   You may step down.

14          THE WITNESS:   Thank you.

15          THE COURT:   You may proceed.

16          MS. PETRUSKA:   We will have to see if our

17  reader is here.

18          MS. BARTH:   And can we take a quick break to

19  discuss with the defendants.

20          THE COURT:   Yeah, members of the jury, we will

21  be in recess for two minutes, so you can go to the jury

22  room for a very short time.   We will have you back in.

23              (At 4:37 p.m., the Proceedings stood in

24  temporary recess.)

25          THE COURT:   Tell me what we need to know.

1        MS.  BARTH:   Based upon your rulings earlier

2    today, we have a copy that has been stricken to what

3    needs to be stricken.  We just need a copy made for the

4    reader.  So I have one as well.  Can we do it by hand?

5        THE COURT:  You need time to go copy a

6    deposition.  How long is this going to take and where

7    is your photocopier that you are going to use.

8        MS.  BARTH:  I have another copy that I'll go

9    through, if you don't want to make a copy.  It will

10   take a few extra minutes to do that.

11       THE COURT:  This is from the rulings I did at

12   8:30 this morning.

13       MS.  BARTH:  Yes.

14       THE COURT:  Okay.  How long is the deposition

15   that we need to photocopy.

16       MS.  BARTH:  30 something pages.

17       THE COURT:  Okay.  We will copy it for you.

18   How many copies?

19       MR.  HOELL:  We are going to be working off the

20   same copy as well.  One for the witness, I believe.

21       THE COURT:  One for the witness then, let's go

22   off the record.

23       (A discussion was held off the record.)

24       THE COURT:  Back on the record.

25       MR.  HOELL:  Defendant would like to revisit

1    the issue prior to reading the deposition of the

2    admissibility of the 2012 -- plus, there is evidence

3    based on the testimony of the plaintiff and his views

4    on how this transfer, which I did not receive, would

5    benefit and aid his career, and that the allegation

6    even could have been made to the jury that this is

7    somehow a clearer path or --

8                THE COURT:  Is this a deposition portion?

9                MR. HOELL:  Correct.

10               THE COURT:  We only have one copy of the

11   deposition.  Show me the page and line we are talking

12   about.  Tell me exactly what you are asking me to do.

13               MS. BARTH:  Page 27.

14               THE COURT:  Tell me the page lines you are

15   asking me to allow in evidence that I previously

16   excluded, page 37, starting at eight.  Where does the

17   excerpt end that you want me to include.

18               MR. HOELL:  I gave away my copy.  It goes on

19   for a couple of pages, I believe.

20               THE COURT:  Is this something I ruled on this

21   morning.  I don't recall it.  This was part of the

22   motion in limine?

23               MR. HOELL:  Correct.  It ends on line 11 on

24   page 39.

25               THE COURT:  All right.  Let me review these

1    pages.  This refers to an exhibit.  Is that something

2    that's going to be used here or not.

3            The first question is:  "I'm now showing you

4    Plaintiff's Exhibit 34.  Please tell me if you have

5    seen that before.

6            Answer:  Yes, yes sorry."

7            You want that in evidence, but you are not

8    going to show us Plaintiff's Exhibit 34, or are you

9    going to show it.

10           MR. HOELL:  If I got that evidence in, then I

11   probably would.

12           THE COURT:  Okay hold on for a second, is your

13   argument that, well, he couldn't have been damaged by

14   this, because he wouldn't have been promoted anyway?

15           MR. HOELL:  That regardless of the position he

16   held at the police department, it comes down to how you

17   are doing, high-profile or not.

18           THE COURT:  And your response, Ms. Petruska,

19   why isn't that relevant, even if he had gotten this

20   job, he still wouldn't have qualified for a promotion.

21           MS. PETRUSKA:  Because we are not claiming

22   that it is an element of damages.  We are not claiming

23   any lost wages as an element of damages, and it would

24   be like saying that firing somebody wasn't an adverse

25   employment.  The issue is whether it is an adverse

116

1    employment action.

2             THE COURT:   No.   This is an issue of damages.

3    Your witnesses said there are bad things that happen to

4    me, because I didn't get the job.   Part of why I wanted

5    the job it could lead to a promotion.   This really is

6    not an issue of whether it is an adverse employment

7    action.   It is a separate issue that he is claiming

8    damages.   He said all of the things happened, because I

9    didn't get the job.   They were emotional and all of

10   these things, and it would have been a better job,

11   because I would have an opportunity for promotion.   So

12   why isn't it relevant on the damages aspect?

13            MS. PETRUSKA:   The only thing that came up in

14   terms of an opportunity for promotion was when there

15   was a question by Ms.--

16            THE COURT:   Yeah, I understand.

17            MS. PETRUSKA: -- Tucker, and I objected.

18            THE COURT:   Hold on just a second.   Why don't

19   you bring the jury in.

20            I'm going to send the jury home, because I do

21   want to hear argument on this.   I think I'm actually

22   not totally sure these two things were in each other.

23   The issue is whether this is an adverse employment

24   action verses -- you know, damages issues.   I think --

25   I'm not sure the way I just stated it is correct.

1          (At 4:47 p.m., the Proceedings resumed in open

2     court.)

3          THE COURT:   You may be seated.   So members of

4     the jury, you are going to get a slightly early

5     afternoon today, because we do have to talk about

6     something with regard to this next evidence, and we are

7     going to let you go, so we can talk about it after you

8     are gone, rather than making you wait in the jury room.

9     It is almost 5 o'clock.

10         I'm going to remind you the instructions that

11    I gave you earlier today, that during this recess, or

12    any other recess, you must not discuss the case with

13    anybody.   You must not communicate in any way, whether

14    over the internet, or texting on your phone, or any

15    way, and you may not do any research about the case.

16         I know when you go home after the first day of

17    the jury trial, people are going to say what happened,

18    what happened.   What's the case about.   It is tempting

19    to say it is about a police officer, and the city, and

20    please don't do that, because you never know when

21    somebody, your next door neighbor, your husband, you

22    spouse or kids would say, I know somebody has had

23    something similar happen, or I saw something like that

24    on TV, not this case, I assure you, but all of a sudden

25    you are hearing things that might influence your

118

1    decision here, even though you would try not to do it,
2    I'm sure.

3            Here is what you can tell them, you can say:
4    "Look I got picked on a jury.  It is a civil case.  I'm
5    in Federal Court.  It is Judge Perry's Court.  I can
6    tell you all about it either on Wednesday or Thursday,
7    when it is all over."

8            Once it is finished, you are free to talk
9    about the case.  But essentially, you can't talk or
10   communicate in any way, and even with each other, that
11   you cannot talk about the case until you have it with
12   deliberations.

13           With that, you are excused, and we'll start at
14   9 a.m. tomorrow.  You can come earlier, it will be open
15   by 8:30 or earlier.  If you want to come earlier, you
16   can.  I do often warn people that -- I can't remember
17   what I always say -- the traffic will be easier, but
18   the parking will be harder, because you are coming a
19   little later than you did this morning, if you are not
20   used to driving downtown.

21           I can't be sure about any of those things.  So
22   I'll see you in the morning at 9 a.m., just leave your
23   books on the chairs, then they will be there for you in
24   the morning, thank you very much.

25           (At 4:50 p.m., the Proceedings stood in

1    temporary recess.)

2          THE COURT:   Here is the issue that I need you

3    all to clarify for me, and so the evidence is that the

4    plaintiff took the Lieutenant's test in 2012, but did

5    not score in a way that would have allowed him to be

6    promoted to Lieutenant in any event, right?

7          MR. HOELL:   42 people would have had to be

8    promoted ahead of him, before he would be considered.

9          THE COURT:   Right, so I think the defendant's

10   argument is actually twofold, and I think I was saying

11   this was one, and not the other, and I'm not sure if

12   there is an argument about whether not getting this

13   position was an adverse employment action, and argument

14   as well, it could lead to promotion, but because it

15   wasn't actually a promotion.

16         The plaintiff has stated why he believes it

17   was a better job, a different job, it gave him an

18   opportunity for promotion, even though he didn't get a

19   higher rank.   That is why he believes it meets the

20   legal definition of an adverse employment action.

21   That's what he said more or less.

22         The other argument is well, he wouldn't have

23   been promoted to Lieutenant anyway, because he didn't

24   rank high enough on the test.   So he can't claim any

25   loss for not getting a promotion, but the plaintiff is

1    not claiming a promotion.  He is not claiming that he

2    would have made Lieutenant necessarily.  He is not

3    claiming any lost wages or differential in the wages he

4    would have gotten as a Lieutenant.

5            So why is the performance on the 2012

6    relevant.  What does it go to.  Is it going to damages.

7    Is it going to adverse employment action or both?

8            MR. HOELL:  The argument would be both, your

9    Honor, especially when this witness that it came up

10   with, Mr. Robins, his whole point is that based on his

11   time as a member of the Board of Police Commissioners,

12   Assistant Director position is high-profile, and he

13   testified, I believe, that six out of nine people who

14   have held this have gone onto Lieutenant.

15           He is laying that foundation that you have

16   this job, you become Lieutenant, and I think that opens

17   the door to well, not Sergeant Bonenberger, based on

18   how he tested on this 2012 test.

19           THE COURT:  Is that what he says here,

20   Ms. Petruska.  I never read the deposition, so this may

21   well -- I don't know why you are calling him as expert

22   witness.  I didn't even know there were going to be any

23   expert witnesses, but since nobody has objected to

24   expert testimony --

25           MR. HOELL:  I also point out, your Honor, the

121

1    results of -- Exhibit 34, the 2008, 10 and 12 Sergeant

2    promotion list is a plaintiff exhibit.  We have not

3    objected to that.  They may -- this is on their exhibit

4    list for trial as well.

5            THE COURT:  So what does this -- what is your

6    response, Ms. Barth?

7            MS. BARTH:  My response is you granted our

8    motion in limine in pretrial where this deposition had

9    already taken place.

10           THE COURT:  I said they could approach the

11   bench if they thought the door had been opened.  I want

12   -- you tell me, not what I said, or what the previous

13   rulings were, tell me why this person is testifying,

14   and what they say, because if this is valid

15   cross-examination of his expert testimony, then it

16   seems to me, I excluded it erroneously.

17           MS. BARTH:  His testimony is about the fact

18   that within the department, this is a career-enhancing

19   position, not necessarily that you are going to be

20   promoted immediately to Lieutenant, which they did

21   cross-examine on that, and that is included in the

22   deposition.

23           My understanding was if David Bonenberger

24   opened the door to it, they were going to reargue it.

25           THE COURT:  If you, the plaintiff, opened the

122

1    door to it, but I didn't -- no one told me that this
2    was what this expert witness was going to be saying.
3    Can you give me what of this deposition you are going
4    to read into evidence, so I can read it tonight, and
5    see if this is proper cross-examination.
6            MS. BARTH:  Sure.  We can leave you -- I have
7    a blacked-out copy of things we definitely agreed to.
8    We had already agreed to strike the portions about the
9    2012 Lieutenant's exam.
10           THE COURT:  Right, that's why he said.  I'm
11   asking you to reconsider it.  That's what he said.
12           MS. BARTH:  There is an asterisk on our copy,
13   because we had agreed, but I can send you two copies,
14   if you want to see.
15           THE COURT:  Yeah, I just need one copy.  You
16   can write a note on it saying:  "This is the part that
17   he wants in.  That we want out."
18           MS. BARTH:  I'm just -- there is an asterisk.
19   It may be hard for you to read.
20           THE COURT:  Here is another copy of the
21   deposition.
22           MR. HOELL:  That's my only copy.
23           THE COURT:  You can have it back.  I need you,
24   all right, now in the next five minutes, to give me
25   what it is the plaintiff wants to introduce, and what

1    it is the defendant wants to introduce.  What you have

2    agreed on, and then what is disputed.  If you have one

3    -- if it is just that has a big X through it, as

4    opposed to a giant magic marker through it, I can

5    probably read it.

6              MS.  BARTH:  You can have it.

7              THE COURT:  Okay.  Let me make sure that I

8    understand.  The part that I had excluded is on page --

9              MR.  HOELL:  Starts on page 37, your Honor.

10             THE COURT:  Okay.  The disputed part starts on

11   37 at --

12             MR.  HOELL:  Line eight.

13             THE COURT:  Okay.  To, when does it end?

14             MR.  HOELL:  It ends at page 39, line 12, would

15   be the last part in dispute probably.

16             THE COURT:  Probably line seven, since that's

17   the answer, and the rest is just an objection, right.

18   It won't be.

19             MR.  HOELL:  Yes.

20             THE COURT:  So line seven.  Okay.  I will look

21   at this, and I want everybody to be here at 8:45 in the

22   morning.  I'll go on the record at 8:45.  I'll give you

23   my rulings on this at that point.  What else do we need

24   to discuss before we start tomorrow?

25             MS.  BARTH:  The only thing, Judge, if you want

1    me to hand you a copy of what we had written on the

2    jury instructions for the deposition testimony.

3         THE COURT:  If you have an instruction you

4    wish me to give before this testimony, by all means

5    tell me.

6         MR. HOELL:  Judge, for scheduling purposes, I

7    don't know if they have an idea how many more

8    witnesses.

9         THE COURT:  What is your estimation of when

10   you will finish?

11        MS. PETRUSKA:  Probably sometime tomorrow

12   morning.

13        THE COURT:  That tells the defense what they

14   need to know.  So you all are saying you would like me

15   to give this testimony?

16        MR. HOELL:  Prior to the reading, yes, your

17   Honor.

18        THE COURT:  Yeah.  So I will do this, although

19   I may not say -- even say his name.

20        Here is the question, every time we have a

21   reading of a deposition, isn't the person reading it

22   not the witness.  Because by definition, if it was the

23   witness, we wouldn't be reading the deposition, right?

24        MR. HOELL:  Correct.

25        THE COURT:  But you want me to say this

1    witness reading is not the witness, because the witness

2    isn't here.  This is somebody else reading the answers.

3            I'll do that.  I'm telling you that's what

4    always happens.  I don't mind reading this.  I'm just

5    trying to tell you to think through the logic of it.

6    I'm giving you grief at the end of the first day of

7    trial, and I apologize.  You all have been working

8    hard.

9            Is there anything else we need to discuss at

10   all in the plaintiff's case, so we will be ready for

11   any unexpected things, or anything else I need to

12   resolve?

13           MS. TUCKER:  Your Honor, my only other

14   question is whether there is any other depositions?

15           THE COURT:  Is this the only deposition

16   testimony that you are going to read?

17           MS. PETRUSKA:  You asked me about --

18           THE COURT:  Hold on, off the record.

19           (A discussion was held off the record.)

20           MS. PETRUSKA:  There maybe objections, Judge

21   about one of the readings, but I need to look at that

22   tonight to figure out if I'm really going to use it,

23   which I may not, so there wouldn't be any other issues

24   about reading.  That's the Mokwa deposition.

25           THE COURT:  You all will discuss it tonight.

1          MS. PETRUSKA:  I told -- yes, I told Ms.

2    Tucker that I would look at it when I get back to the

3    office, and I would e-mail her, so that we can figure

4    out where we are and know where we are when we come in

5    tomorrow.

6          THE COURT:  Okay, because I don't really want

7    to spend a lot of time with the jury in the jury room

8    while we're discussing something we could have

9    discussed.  Do we need to come in earlier tomorrow,

10   just in case?

11         MS. PETRUSKA:  I don't think I'm going to use

12   it.

13         THE COURT:  Okay 8:45, I will see you then,

14   that's what we will do.

15         I do apologize for giving you guys grief

16   today.  I know you are working hard, but some of the

17   stuff you need to think through.  Court is in recess.

18              (End of proceedings)

19

20

21

22

23

24

25

1

2                    C E R T I F I C A T E

3

4           I, Lisa M Paczkowski, Registered Professional

5    Reporter, hereby certify that I am a duly appointed

6    Official Court Reporter of the United States District

7    Court for the Eastern District of Missouri.

8           I further certify that the foregoing is a true

9    and accurate transcript of the proceedings held in the

10   above-entitled case and that said transcript is a true

11   and correct transcription of my stenographic notes.

12          I further certify that this transcript

13   contains pages 1 through 128 inclusive and that this

14   reporter takes no responsibility for missing or damaged

15   pages of this transcript when same transcript is copied

16   by any party other than this reporter.

17          Dated St. Louis, Missouri, this 3rd day of

18   September, 2014.

19

20

21   -------------------------------------------

22   /s/Lisa M Paczkowski
     Lisa M Paczkowski, CCR, CSR, RPR
23   Official Court Reporter

24

25